1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10 | AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-

CASE NO. C25-451 MJP

11 | CIO; AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTION

12 | CIO TSA LOCAL 1121;
COMMUNICATIONS WORKERS OF

13 | AMERICA, AFL-CIO; and
ASSOCIATION OF FLIGHT

14 | ATTENDANTS-CWA, AFL-CIO,

15                     Plaintiffs,

16          v.

17 | KRISTI NOEM; U.S. DEPARTMENT
OF HOMELAND SECURITY; HA

18 | NGUYEN MCNEILL; and
TRANSPORTATION SECURITY

19 | ADMINISTRATION,

20                     Defendants.

21

22

This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction.

23

(Dkt. No. 18.) Having reviewed the Motion, Defendants' Response (Dkt. No. 26), the Reply

24

1    (Dkt. No. 34), and all supporting materials, and having held oral argument on May 27, 2025, the

2    Court GRANTS the Motion and ENTERS a preliminary injunction as requested by Plaintiffs on

3    the terms set forth in the Conclusion.

4                                          **INTRODUCTION**

5         Every day, airline travelers rely on Transportation Security Officers (TSOs) to help them

6    travel safely to their destination. As part of the Transportation Security Administration that

7    Congress created in 2001, TSOs play a critical role in air travel security. But TSOs have not

8    always been happy with the conditions of their employment, which has put TSA's safety mission

9    at risk. After ten years during which the TSA Administrator refused to allow collective

10   bargaining, the TSA Administrator found in 2011 that poor employee morale and engagement

11   threatened the security of air travelers and the ability of TSA to carry out its congressionally-

12   mandated mission. As part of this 2011 action, the TSA Administrator undertook a detailed

13   review of workforce data, employee surveys, and competing views to identify ways to ensure the

14   agency could make good on its mission of providing air travel safety. To remedy the problem,

15   the Administrator exercised his congressionally-authorized discretion to permit collective

16   bargaining for TSOs as a means of increasing employee satisfaction and ensuring TSA could

17   meet its safety mission.

18        Since 2011, collective bargaining and voluntary union membership have been fixtures of

19   TSO employment. Most recently, in 2024, the TSA and Plaintiff American Federation of

20   Government Employees, AFL-CIO (AFGE) entered into a new collective bargaining agreement

21   that allows those TSOs who desire the benefits of union representation to voluntarily join AFGE

22   and enjoy various work-place protections, union representation in disciplinary hearings and

23   grievances, and to have collective bargaining rights over various aspect of employment. Of the

24

1    roughly 47,000 TSOs, nearly 26,000 have chosen to become AFGE members. As the 2024 CBA

2    states, "[t]he Agency and the Union (the Parties) recognize that bargaining unit employees are

3    essential to achieving the Agency's critical security mission and that a cooperative working

4    relationship between labor and management plays a vital role in the success of the bargaining

5    unit employees." (2024 CBA, Art. 1 Preamble.) "The Parties recognize that the labor

6    management relationship must be built on a solid foundation of trust and mutual respect,

7    promote a quality work environment for all employees, and enable successful performance of

8    TSA's mission." (Id.) The 2024 CBA has a seven-year term that "may only be changed upon

9    mutual written consent of the parties." (2024 CBA Arts. 13(A)(3), 37(B).)

10        Contrary to the prior findings of the TSA Administrator and the express terms of the

11   2024 CBA, Secretary of the Department of Homeland Security (DHS), Kristi Noem, issued a

12   determination on February 27, 2025, barring TSOs from engaging in collective bargaining and

13   rescinding the 2024 CBA. (The "Noem Determination".) The Noem Determination casts AFGE

14   as an enemy to TSOs. She claims that "misplaced directives [of the TSA which allowed

15   collective bargaining] have solely benefitted the American Federation of Government Employees

16   (AFGE) at TSOs' expense, impeded Congressional intent of a flexible workforce, and failed to

17   serve TSA's critical mission to protect the transportation system and keep Americans safe."

18   (Noem Determination at 2.) Unlike prior determinations that relied on extensive review and

19   robust decision making, Noem supported her decision with citation to various Executive Orders

20   issued by the Trump Administration that disapprove of unionization of federal employees. The

21   Noem Determination furthers the Trump Administration's antagonistic relationship with AFGE,

22

23

24

1    which it has labeled as an "activist organization" that has "declared war on President Trump's

2    agenda."[1]

3           AFGE challenges the Noem Determination, asserting that it reflects retaliation against the

4    Union for its litigation efforts to blunt the Trump Administration's attacks on federal workers. It

5    notes that while the Trump Administration has permitted federal unions who do not oppose

6    Trump's work-force reduction agenda, it has sought to punish those unions, such as AFGE, who

7    have fought for the rights of their members against various anti-union actions of the Trump

8    Administration. Joined by a local AFGE, and two other aviation-related unions, AFGE claims

9    that the Noem Determination constitutes retaliation in violation of the First Amendment, violates

10   Due Process as guaranteed by the Fifth Amendment, and violates the Administrative Procedure

11   Act as an arbitrary and capricious agency action that is also contrary to law. Plaintiffs seek an

12   order preliminarily enjoining the Noem Determination and its rescission of the 2024 CBA,

13   pending resolution of these claims on the merits.

14          The Court here finds that an injunction must issue to preserve the rights and benefits that

15   the 2024 CBA confers to TSOs pending resolution of this litigation. AFGE has demonstrated a

16   strong likelihood that the Noem Determination constitutes impermissible retaliation against it for

17   its unwillingness to acquiesce to the Trump Administration's assault on federal workers. AFGE

18   has shown the Noem Determination likely violates Due Process, having afforded no notice or

19   process for AFGE and its members to work with DHS and TSA to resolve any disagreement

20   before simply shredding the contractual promises of the CBA. And AFGE has shown it is likely

21

22   [1] Fact Sheet, (Mar. 6, 2025) https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-ensuresthe-enforcement-of-federal-rule-of-civil-procedure-65c/; Memorandum on Ensuring the Enforcement of

23   Federal Rule of Civil Procedure 65(c), https://www.presidency.ucsb.edu/documents/memorandum-ensuring-the-enforcement-federal-rule-civil-procedure-65c ("March 6, 2025 Fact Sheet"); Fact Sheet, (Mar. 27, 2025)
     https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-

24   national-security-missions-from-federal-collective-bargaining-requirements/ ("March 27 Fact Sheet").

1   to succeed in showing the Noem Determination is arbitrary and capricious in violation of the

2   Administrative Procedure Act, particularly given its complete disregard for the 2024 CBA and its

3   mischaracterization of AFGE's role.

**BACKGROUND**

5        Plaintiffs AFGE, an AFGE Local, and two other labor unions challenge the February 27,

6   2025 determination of Kristi Noem, Secretary of DHS, to end collective bargaining and rescind

7   the 2024 CBA entered into between AFGE and the TSA. Plaintiffs contend the Noem

8   Determination violates the Administrative Procedure Act, constitutes First Amendment

9   retaliation, and violates the Fifth Amendment by failing to accord the AFGE and its members

10  with any due process. Plaintiffs now seek a preliminary injunction to stop the enforcement of the

11  Noem Determination and ensure the 2024 CBA remains in place for the duration of this litigation

12  and, ultimately, for its full seven-year term. To orient the reader, the Court reviews the relevant

13  background regarding the parties, the TSA's historic approach to collective bargaining for TSOs,

14  the Noem Determination, and evidence of anti-AFGE animus behind the Noem Determination.

15  **A.    Parties**

16       Plaintiffs include: (1) AFGE; (2) AFGE TSA Local 1121; (3) the Communications

17  Workers of America (CWA); and (4) the Flight Attendants-CWA, AFL-CIO (AFA). (Compl. ¶¶

18  15, 20, 22, 24.) AFGE is the largest federal union, representing approximately 800,000 federal

19  civilian employees through its affiliated councils and locals in every state in the United States,

20  which includes "security officers protecting our airports and airplanes[.]" (Id. ¶¶ 15-16.) AFGE

21  TSA Local 1121 is a labor organization and unincorporated association residing in Kent,

22  Washington that represents transportation security officers, including those at Sea-Tac. (Id. ¶ 20.)

23  CWA is a labor union that represents approximately 30,000 workers including some who work

24

1    in airports across the nation who handle ticketing, luggage, and other customer services. (Id. ¶

2    22.) Plaintiff AFA is a labor union that represents over 55,000 flight attendants who rely on

3    TSOs to help ensure safe and secure airport screening. (Id. ¶¶ 24-25.) Plaintiffs pursue their

4    claims on behalf of their members, and the AFGE national and local bring claims on their own

5    behalf. (Id. ¶¶ 15, 19, 21, 23, 26.)

6        Plaintiffs bring claims against DHS and its Secretary, Kristi Noem, and TSA, and its

7    acting Administrator, Ha Nguyen McNeill (who was substituted for Adam Stahl, named in the

8    Complaint) (Compl. ¶¶ 27-30; Reply at i.)

9    **B.    Background to 2024 CBA**

10        Passed in 2001, the Aviation and Transportation Security Act (ATSA) created the TSA to

11    be led by an Administrator appointed by the President with the advice and consent of the Senate

12    for a five-year term. 49 U.S.C. § 114(a), (b). Unlike other federal employees, TSA employees are

13    governed by a personnel management system established by the administrator of the Federal

14    Aviation Administration, subject to modifications made by the TSA Administrator. 49 U.S.C. §

15    114(n). As to Transportation Security Officers (TSOs), the Administrator "may employ, appoint,

16    discipline, terminate, and fix the compensation, terms, and conditions of employment." ATSA §

17    111(d), 49 U.S.C. § 44935 note. Congress provided the Administrator "shall establish levels of

18    compensation and other benefits for individuals so employed." Id.

19        In 2003, James M. Loy, the Under Secretary of the Department of Transportation,

20    determined that the newly-formed TSA's screeners would not be permitted to engage in

21    collective bargaining. See Am. Fed'n of Gov't Emps., AFL-CIO v. Loy, 281 F. Supp. 2d 59, 61

22    (D.D.C. 2003), aff'd, 367 F.3d 932 (D.C. Cir. 2004). The Court refers to this as the Loy

23    Determination. But in 2011, TSA Administrator John S. Pistole established a collective

24

1   bargaining structure for TSOs. (Decision Memorandum from John S. Pistole (Feb. 4, 2011)

2   (2011 Determination) (Ex. 1 to the Declaration of Amelia Glymph Ex. 1 (Dkt. No. 19-1)).)

3   Pistole based his decision on employee surveys, workforce data, and "many views in the context

4   of considering TSA's mission requirements" and determined that TSA "must and will continue

5   to do better with and by our employees to ensure we continue to accomplish our mission." (Id. at

6   2.) Pistole noted the prior Administrator's decision in 2003 to precluded collective bargaining,

7   and acknowledged the concerns about "potential problems that might arise from collective

8   bargaining." (Id. at 3-4.) But he endorsed collective bargaining and labor unions who "can help

9   develop solutions for some systemic issues, bring local concerns to national attention when

10  existing mechanisms prove inadequate to the task, bring forth the concerns of employees who

11  choose to have them do so and serve as an advocate for those employees who choose not to

12  advance their concerns themselves." (Id. at 4.)

13      In June 2011, TSOs elected AFGE to be their exclusive representative, and AFGE began

14  bargaining collectively with TSA. (Glymph Decl. ¶¶ 6-7, 9.) In November 2012, the parties

15  signed their first binding CBA. (Id. ¶ 9.) TSA and AFGE agreed to new CBAs in 2016 and 2020.

16  (Id. ¶ 10.) In late 2022, the TSA Administrator David Pekoske, who was appointed by President

17  Trump, issued a new determination on collective bargaining. (Determination from Pekoske on

18  Transp. Sec. Officers and Collective Bargaining (Dec. 30, 2022) ("2022 Determination")

19  (Glymph Decl. Ex. 2).) Pekoske noted that his determination "reflects TSA's strategic priority to

20  'Commit to our People' recognizing TSA's dedicated employees are critical to the success of our

21  mission." (Id. at 1.) The 2022 Determination expanded collective bargaining rights to TSOs,

22  while "retain[ing] sole and exclusive discretion over pay and policies affecting pay." (Id. §§ 5,

23  6.)

24

1    In May 2024, AFGE and TSA signed their current CBA—the "2024 CBA". (Glymph

2    Decl. ¶¶ 16-17 & Ex. 3.) The 2024 CBA sets certain terms and conditions of employment for

3    TSOs and provides for national and local level bargaining on a number of issues affecting TSO

4    employment. (2024 CBA Arts. 3, 5, 13.) The 2024 CBA recognized AFGE as TSOs' exclusive

5    representative. (Id. Art. 5(A).) It also gave TSOs a right to have a union representative present in

6    disciplinary interviews (Weingarten rights), and it granted AFGE the right to be present at formal

7    discussions about grievances or conditions of employment. (Id. Arts. 5(C), 26.) The 2024 CBA

8    also provided that discipline or adverse actions "may be taken for just cause and only for reasons

9    that will promote the efficiency of the service." (Id. Art. 27(C).) As to its term, the CBA that it

10   "may only be changed upon mutual written consent of the parties" and "will remain in full force

11   and effect" for seven years. (2024 CBA Arts. 13(A)(3), 37(B).) And while no TSO is required to

12   join the union or pay dues, if a TSO voluntarily chooses to pay dues through their paycheck, the

13   2024 CBA guarantees that TSA would deduct those dues and "timely remit the dues deduction to

14   AFGE." (Id. Art. 7.) The 2024 CBA also established a binding grievance and arbitration process

15   allowing parties to challenge CBA violations or other violations affecting conditions of

16   employment. (Id. Arts. 28-29.)

17   In its preamble, the 2024 CBA states: "The Agency and the Union (the Parties) recognize

18   that bargaining unit employees are essential to achieving the Agency's critical security mission

19   and that a cooperative working relationship between labor and management plays a vital role in

20   the success of the bargaining unit employees." (2024 CBA, Art. 1 Preamble.) "The Parties

21   recognize that the labor management relationship must be built on a solid foundation of trust and

22   mutual respect, promote a quality work environment for all employees, and enable successful

23   performance of TSA's mission." (Id.) In press release from the government, Pekoske lauded the

24

1  CBA teams and its terms. (Glymph Decl. Ex. 3.) The Press Release noted that "[w]hile the new

2  CBA contains more bargaining unit employee and union rights than previous CBAs, it also

3  maintains the flexibility necessary to carry out TSA's security mission." (Id. at 2.)

4  **C.    Rescission of the 2024 CBA**

5         On February 27, 2025, Secretary Noem issued a memorandum to Adam Stahl, the senior

6  official performing the duties of the Administrator of TSA, entitled "Supporting the TSA

7  Workforce by Removing a Union That Harms Transportation Security Officers." ("Noem

8  Determination" (Glymph Decl. Ex. 5).) The Noem Determination states that "[e]ffective

9  immediately," she rescinded the 2022 Determination and claimed that the 2024 CBA is "no

10 longer applicable or binding and is hereby rescinded." (Id. at 3.) She wrote that "AFGE is no

11 longer the exclusive representative" of TSOs and discontinued the ability for TSOs to pay

12 voluntary dues from their paychecks. (Id. at 3-4.)

13        Claiming that "$15M is annually deducted from TSOs' paychecks" Noem stated in her

14 memo that the 2022 Determination's "misplaced directives have solely benefitted the American

15 Federation of Government Employees (AFGE) at TSOs' expense, impeded Congressional intent

16 of a flexible workforce, and failed to serve TSA's critical mission to protect the transportation

17 system and keep Americans safe." (Noem Determination at 2.) Noem also cited several other

18 Executive Orders issued by President Trump and memoranda from the U.S Officer of Personnel

19 Management Acting Director on collective bargaining. (Id. at 2-3.) In a follow-on press release,

20 DHS stated that "TSOs are losing their hard-earned dollars to a union that did not represent or

21 protect their interests." (Ex. 7 Glymph Decl. at 2.) The press release includes a statement from a

22 DHS spokesperson: "Thanks to Secretary Noem's action, Transportation Security Officers will

23 no longer lose their hard-earned dollars to a union that does not represent them. The Trump

24

1  Administration is committed returning to merit-based hiring and firing policies." (Id.) AFGE and

2  its members received no notice of or opportunity to be heard before the Noem Determination

3  issued. (Glymph Decl. ¶ 30.)

4  **D.    Alleged Harm to AFGE and Government Animus**

5        Plaintiffs have identified a number of harms flowing from Noem's rescission of the 2024

6  CBA. First, AFGE is now prevented or impaired from performing the "core services of

7  representing bargaining unit employees in grievances and arbitrations[.]" (Glymph Decl. ¶ 35.)

8  Second, AFGE can no longer pursue the approximately 200 grievances and 37 arbitrations

9  pending nationwide on behalf of TSOs. (Id. ¶ 36.) Third, the rescission of the 2024 CBA has also

10 resulted in the immediate loss of membership dues for 24,178 members, which "materially

11 impairs AFGE's ability to conduct representational work on behalf of TSOs by depriving AFGE

12 of financial resources that it sues to fund its representational activities on behalf of TSOs, such as

13 arbitration." (Id. ¶ 41.) Fourth, according to AFGE's representative, the loss of the 2024 CBA

14 will have a substantial chilling effect on AFGE's ability to recruit members and members will be

15 less likely to report violations of law or TSA policies now that AFGE cannot represent them. (Id.

16 ¶¶ 42-43.) Fifth, TSOs no longer enjoy the "just cause" protections from termination. (See 2024

17 CBA Art. 27(C)).

18        Plaintiffs cite to various evidence of the Defendants' claimed animus against AFGE.

19 First, Plaintiffs note that Noem Determination itself attacks AFGE by name, stating the prior

20 determinations and CBA "have solely benefited the American Federation of Government

21 Employees (AFGE) at TSOs' expense." (Glymph Decl. Ex. 5 at 2.) Second, Plaintiffs note that

22 the Noem Determination follows AFGE's litigation efforts to push back against the Trump

23 Administration's decision to terminate federal workers and limit their collective bargaining

24

1   rights. <u>See, e.g.</u>, <u>AFGE v. Trump</u>, No. 1:25-cv-00264 (D.D.C.); <u>AFGE v. Ezell</u>, No. 1:25-cv-

2   10276 (D. Mass.); <u>AFGE v. OPM</u>, No. 3:25-cv-01780 (N.D. Cal.). Plaintiffs highlight that on

3   February 27, 2025 (the same day of the Noem Determination), a district court issued a temporary

4   restraining order against the Office of Personnel Management, in favor of AFGE. <u>AFGE v.</u>

5   <u>OPM</u>, 2025 WL 660053, at *14 (N.D. Cal. Feb. 28, 2025) (referencing Feb. 27 oral order).

6   Third, Plaintiffs assert that President Trump issued a memorandum for agency heads targeting

7   litigants like AFGE, stating "[i]n recent weeks, activist organizations . . . have obtained sweeping

8   injunctions . . . undermining the democratic process." <u>See</u> Fact Sheet, (Mar. 6, 2025)

9   https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-

10  ensuresthe-enforcement-of-federal-rule-of-civil-procedure-65c/; Memorandum on Ensuring the

11  Enforcement of Federal Rule of Civil Procedure 65(c),

12  https://www.presidency.ucsb.edu/documents/memorandum-ensuring-the-enforcement-federal-

13  rule-civil-procedure-65c ("March 6, 2025 Fact Sheet"). And in a "Fact Sheet" from the White

14  House, it claims that "hostile Federal unions [have been trying] to obstruct agency management,"

15  noting that "Certain Federal unions have declared war on President Trump's agenda" including

16  "[t]he largest Federal union [which] describes itself as 'fighting back' against Trump" and "is

17  widely filing grievances to block Trump policies." Fact Sheet, (Mar. 27, 2025)

18  https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-

19  agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/

20  ("March 27 Fact Sheet"). The largest Federal union is AFGE. But Defendants do point out that

21  both Fact Sheets post-date the Noem Determination. Fifth, Plaintiffs point out that unions the

22  President believes will "work with him," still have collective bargaining rights, which

23  undermines the justification advanced in the Noem Determination. <u>See</u> Order, 90 Fed. Reg.

24

1    16427 (Apr. 17, 2025) (expressly restoring bargaining rights to specific unions); Erich Wagner,

2    *VA is selectively enforcing Trump's order stripping workers of union rights*, Government

3    Executive (Apr. 18, 2025), https://www.govexec.com/workforce/2025/04/va-selectively-

4    enforcing-trumps-order-stripping-workers-union-rights/404694/ (VA spokesperson stating that

5    unions whose rights were restored "filed no or few grievances against VA").

6                                          **ANALYSIS**

7            After examining standing and various arguments Defendants have raised concerning the

8    Court's jurisdiction, the Court analyzes the merits of the preliminary injunction request.

9    **A.      Plaintiffs Have Standing**

10           Although Defendants do not contest Plaintiffs' standing, the Court briefly reviews the

11   issue. Both AFGE and the AFGE Local have organizational standing, as the Noem

12   Determination here "perceptibly impair[s] their ability to perform the services they were formed

13   to provide." E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 663, 677 (9th Cir. 2021). These

14   same Plaintiffs have standing to represent their members, who had grievances terminated and

15   have lost protections including "just cause" protections and union representation in investigatory

16   interviews. See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ., 82

17   F.4th 664, 681 (9th Cir. 2023) (en banc) (describing representational standing requirements).

18   **B.      The Court has Jurisdiction Over Plaintiffs' Claims Notwithstanding the FLRA**

19           Defendants argue that the Court lacks jurisdiction because Congress has committed this

20   kind of dispute to resolution before the Federal Labor Relations Authority (FLRA). This

21   argument rests on a very limited jurisdictional preclusion theory announced in Thunder Basin

22   Coal Co. v. Reich, 510 U.S. 200, 207 (1994). The Court disagrees with Defendants' argument,

23   finding that the agency action here is not of the kind committed to the FLRA's limited review.

24

1    To unpack the arguments, the Court reviews the scope and function of the FLRA, the

2    contours of Thunder Basin preclusion, and the question of whether the claims here must be

3    brought before the FLRA.

4        **1.    The FLRA**

5    "In 1978, Congress enacted the Federal Service Labor-Management Relations Statute

6    (the "Statute" or FSLMRS) to govern labor relations between the executive branch and its

7    employees." Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 752 (D.C. Cir.

8    2019). The Statute is set forth in Title VII of the Civil Service Reform Act (CSRA) and codified

9    at 5 U.S.C. §§ 7101-35. Id. (citing Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (1978)).

10   "The Statute also establishes a scheme of administrative and judicial review" through "the

11   Federal Labor Relations Authority (FLRA), a three-member agency charged with adjudicating

12   federal labor disputes, including 'negotiability' disputes and 'unfair labor practice' disputes." Id.

13   (citing 5 U.S.C. § 7105(a)). "In negotiability disputes, the FLRA determines whether agencies

14   and unions must bargain over certain subjects." Id. (citing 5 U.S.C. §§ 7105(a)(2)(E),

15   7117(c)(1)). And "[i]n unfair labor practice proceedings, the FLRA resolves whether an agency

16   must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to

17   comply with the Statute." Id. (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118). Any decision

18   from the FLRA may be appealed to the D.C. Circuit Court of Appeals. Id. (citing 5 U.S.C. §

19   7123(a), (c)).

20       **2.    Thunder Basin Preclusion**

21   District courts generally have jurisdiction over claims arising under federal law. See 28

22   U.S.C. § 1331. But "[a] special statutory review scheme, this Court has recognized, may

23   preclude district courts from exercising jurisdiction over challenges to federal agency action."

24

1   Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. 175, 185 (2023) (citing Thunder Basin Coal

2   Co. v. Reich, 510 U.S. 200, 207 (1994)). Congress may explicitly remove jurisdiction for certain

3   claims or it may do so "implicitly, by specifying a different method to resolve claims about

4   agency action." Id. As examples of implicit jurisdictional preclusion, the Supreme Court has

5   cited the Exchange Act and FTC Act's inclusion of an agency review process followed by

6   review in a court of appeals. Id. But a comprehensive statutory review process alone does not

7   necessarily mean that every claim concerning agency action falls outside the district court's

8   jurisdiction. Id.

9        To determine whether Congress implicitly sought to preclude general federal jurisdiction,

10  the Court generally asks "whether the particular claims brought were 'of the type Congress

11  intended to be reviewed within this statutory structure.'" Axon, 598 U.S. at 186 (quoting

12  Thunder Basin, 510 U.S. at 208). There are "three considerations designed to aid in that inquiry,

13  commonly known now as the Thunder Basin factors." Id. at 186. First, could precluding district

14  court jurisdiction "foreclose all meaningful judicial review" of the claim? Thunder Basin, 510

15  U.S. at 212–213. This "first Thunder Basin factor recognizes that Congress rarely allows claims

16  about agency action to escape effective judicial review." Axon, 598 U.S. at 186. Second, is the

17  claim "wholly collateral to [the] statute's review provisions"? Thunder Basin, 510 U.S. at 212

18  (internal quotation marks omitted). Third, is the claim "outside the agency's expertise"? Id. "The

19  second and third [considerations] reflect in related ways the point of special review provisions—

20  to give the agency a heightened role in the matters it customarily handles, and can apply

21  distinctive knowledge to." Axon, 598 U.S. at 186. Ultimately, "[w]hen the answer to all three

22  questions is yes, we presume that Congress does not intend to limit jurisdiction." Id. (citation and

23  quotation omitted). "But the same conclusion might follow if the factors point in different

24

1  directions." Id. "The ultimate question is how best to understand what Congress has done—

2  whether the statutory review scheme, though exclusive where it applies, reaches the claim in

3  question." Id.

4      **3.**    **The Claims Are Not Subject to FLRA Jurisdiction under Thunder Basin**

5      The three Thunder Basin considerations here weigh against finding implicit jurisdictional

6  preclusion.

7      The first Thunder Basin consideration weighs in favor of this Court's jurisdiction.

8  Although Defendants are correct that FLRA decisions can be appealed to the D.C. Court of

9  Appeals, that fact alone does not mean that the claims here can be brought before the FLRA.

10  Defendants' argument falls apart because the 2011 and 2022 Determinations and the Noem

11  Determination expressly bar FLRA review in the first instance. The 2011 Determination, which

12  established TSOs' first collective bargaining structure, "set forth . . . a comprehensive structure

13  that is different and distinct, separate and independent, from that provided in 5 U.S.C. Chapter

14  71[.]" (2011 Determination at 5.) The 2011 Determination explained that except for "an election

15  conducted by the FLRA . . . [the] ATSA § 111(d) supersedes the Federal Services Labor-

16  Management Relations statute (5 U.S.C. Chapter 71) in all other respects and therefore Chapter

17  71 shall not apply, or afford any rights, to management, unions, or covered employees that are

18  not expressly provided in this Determination." (Id. at 6.) The 2022 Determination similarly

19  eschewed adoption of FLRA jurisdiction, stating that "[a]s jurisdiction on FLRA cannot be

20  conferred administratively, any provision of Chapter 71 or its implementing regulations

21  regarding FLRA are not adopted by this Determination." (2022 Determination § 9.) And, lastly,

22  Noem's Determination rejected incorporating FSLMRS or FLRA jurisdiction: "This

23  Determination does not incorporate by reference any provisions of Chapter 71 of Title 5 of the

24

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION - 15

1    United States Code or its implementing regulations for these employees, any union, or TSA

2    management." (Noem Determination at 3.) Thus, by the plain language of these three

3    Determinations, Plaintiffs would not be permitted to pursue their claims before the FLRA. At

4    oral argument, Defendants contended that AFGE could bring its claims as an unfair labor

5    practice by asking for review under 5 U.S.C. § 7118(a). But as Plaintiffs noted, this requires

6    petitioning the General Counsel of the FLRA to investigate the claim, 5 U.S.C. 7118(a), and

7    there is no right to appeal the General Counsel's refusal to commence proceedings, see 5 U.S.C.

8    § 7123(a). See Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt., No. C

9    25-01780 WHA, 2025 WL 900057, at *5 (N.D. Cal. Mar. 24, 2025). And, as Plaintiffs pointed

10   out, there is currently no General Counsel of the FLRA, as the position remains vacant. The

11   Court is persuaded by Plaintiffs' arguments that undermine Defendants' position.

12         The second Thunder Basin consideration also weighs in favor of this Court's jurisdiction

13   because the claims are collateral to and far afield of the FLRA's core agency review. Defendants

14   argue that the FSLMRS "'establishes a scheme of administrative and judicial review' for labor

15   relations disputes between the Executive Branch and unions representing federal employees."

16   (Defs. Opp. at 5 (citing AFGE v. Trump, 929 F.3d 748, 752 (D.C. Cir. 2019)). But the FLRA has

17   a far narrower review mandate, principally designed to hear disputes about negotiability and

18   unfair labor practices. AFGE, 929 F.3d at 752. Here, Plaintiffs' challenge to the Noem

19   Determination does not implicate negotiability—whether TSA must bargain with a union—or

20   unfair labor practices. Rather, it challenges the legality of Noem's decision to rescind a fully-

21   bargained-for CBA before its term has expired. The present dispute falls far afield of the core

22   function of the FLRA.

23

24

1      Defendants argue that the FLRA has exclusive jurisdiction for the same reasons the D.C.

2    District Court found that challenges to the 2003 Loy Determination barring collective bargaining

3    were subject to exclusive agency review. (Defs. Opp. at 6-7 (citing Am. Fed'n of Gov't Emps.,

4    AFL-CIO v. Loy, 281 F. Supp. 2d 59, 64–65 (D.D.C. 2003), aff'd, 367 F.3d 932 (D.C. Cir.

5    2004)).) The Court disagrees, given certain fundamental distinctions between the Loy

6    Determination and the Noem Determination. In response to the Loy Determination, AFGE filed

7    petitions with the FLRA to hold union elections, and filed suit in district court, lodging

8    constitutional and APA challenges to the Loy Determination. See Loy, 281 F. Supp. 2d at 61-62.

9    The District Court found that the claims brought before it could have been included in the FLRA

10   action, though it considered them on their merits. Id. at 64-65. On appeal, the D.C. Circuit

11   affirmed dismissal of the action, noting that the constitutional and statutory claims should have

12   been presented to the FLRA. AFGE v. Loy, 367 F.3d 932, 936-37 (D.C. Cir. 2004). While the

13   Loy Determination concerned elections and negotiability that the parties agreed were subject to

14   the FLRA's jurisdiction, the Noem Determination focuses on an agency action to rescind a fully-

15   bargained-for CBA that was already in effect and had nothing to do with elections, negotiability,

16   or unfair labor practices. Nothing in Loy suggests that the Noem Determination falls within the

17   FLRA's core competencies, and Defendants have not explained why it would.

18      Defendants cite to two additional cases where the court found jurisdictional preclusion

19   concerning union claims that had to be brought before the FLRA. (Defs. Opp. at 5-6 (citing

20   AFGE v. Trump, 929 F.3d 748 (D.C. Cir. 2019); Nat'l Treasury Emps. Union v. Trump, __ F.

21   Supp. 3d __, 2025 WL 561080 (D.D.C. Feb. 20, 2025)).) The Court finds neither case persuasive

22   as to the issues raised by the present litigation. Both cases involve challenges to the subjects of

23   collective bargaining or to termination of union members covered by a CBA, not the distinct

24

1    agency action of terminating an entire CBA. The Court briefly reviews both cases to highlight

2    their distinctive differences.

3        First, in <u>AFGE v. Trump</u>, the plaintiffs challenged three executive orders that: "(1)

4    direct[ed] agencies to refuse to bargain over 'permissive' subjects based on 5 U.S.C. §

5    7106(b)(1); (2) establish[ed] government-wide rules for employee and agency conduct, which

6    may have the effect of removing mandatory subjects from bargaining based on 5 U.S.C. §

7    7117(a)(1); and (3) set goals that agencies must pursue during bargaining." <u>Id.</u>, 929 F.3d at 753.

8    The Court explained that these Executive Orders could be challenged before the FLRA because

9    they could form the basis of a "bad-faith bargaining" claim or claim that the Government was

10   ignoring topics of bargaining that must be included under the FSLMRS. <u>Id.</u> at 757-58. But here,

11   the challenge to the rescission of a CBA does not implicate bargaining or elections. Rather, the

12   challenge here is solely to the action of rescinding a CBA, which does not fall within the FLRA's

13   core functions concerning "negotiability" or any other Congressionally-mandated expertise.

14       Second, in <u>NTEU</u>, the plaintiff unions challenged several executive orders that Trump

15   issued to terminate probationary employees, prepare for large-scale reductions in force, and to

16   offer deferred resignation. <u>Id.</u>, 2025 WL 561080, at *1. Unlike here, the unions conceded that

17   they could bring their claims before the FLRA, and the Court found that the FLRA provided for

18   meaningful review, possessed at least some agency expertise, and the collateral claims were not

19   "far afield from the agency's usual review." <u>Id.</u>, at *6-8. Here, the challenge is not to the

20   termination of employees or deferred resignation. The question is whether the Noem

21   Determination to rescind the CBA is permissible and has caused constitutional harms. The

22   question of whether to rescind a CBA is not akin to the question of whether individual

23

24

1  employees may be fired or asked to retire. And Defendants have offered no explanation of how
2  the facts here align.

3      The final <u>Thunder Basin</u> factor also favors finding no claim preclusion because there is
4  no apparent expertise in the FLRA to determine whether a rescission decision violates the APA
5  or the constitution.

6      On balance, the Court finds that the <u>Thunder Basin</u> considerations all point to allowing
7  the case to proceed in this Court. There is little evidence that Congress implicitly intended the
8  FLRA to handle a dispute over an agency decision to rescind a CBA.

9  **C.    The APA Does Not Deprive the Court of Jurisdiction**

10      Defendants argue that the APA bars Plaintiffs' claims because they are essentially breach
11  of contract claims that must be brought before the Court Federal Claims under the Tucker Act,
12  28 U.S.C. § 1491(a)(1). (Defs. Opp. at 16.)  This argument misconstrues Plaintiffs' claims in an
13  errant effort to shoehorn them into a jurisdictional exclusion.

14      As is relevant here, the APA's waiver of sovereign immunity "does not apply to claims
15  for 'money damages' or claims 'expressly or impliedly forbid[den]' by another statute granting
16  consent to suit." <u>Tucson Airport Auth. v. Gen. Dynamics Corp.</u>, 136 F.3d 641, 645 (9th Cir.
17  1998) (citing 5 U.S.C. § 702). Instead, only "[a]gency action made reviewable by statute and
18  final agency action for which there is no other adequate remedy in a court" are subject to judicial
19  review. 5 U.S.C. § 704. As the Ninth Circuit has explained, "the APA waives sovereign
20  immunity for . . . claims only if three conditions are met: (1) its claims are not for money
21  damages, (2) an adequate remedy for its claims is not available elsewhere and (3) its claims do
22  not seek relief expressly or impliedly forbidden by another statute." <u>Tucson Airport</u>, 136 F.3d at
23  645.

24

1    Defendants argue that APA's waiver of sovereign does not reach the claims here because

2    they are all forms of contract claims over which Tucker Act provides an adequate remedy. But

3    Plaintiffs correctly note that the CBA is not a contract over which the Tucker Act confers

4    jurisdiction. "The government's consent to suit under the Tucker Act does not extend to every

5    contract." Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1343 (Fed. Cir. 2008).

6    For the Act to apply, there must be a "money-mandating" feature of the contract that would give

7    a substantive right to recover damages in the event of breach. Id. at 1344. For example, a cost-

8    sharing agreement between the government and a private company was not a money-mandating

9    contract sufficient to confer Tucker Act jurisdiction. Id. Here, the CBA is not a money-

10   mandating agreement—it merely sets forth various agreements about the terms of employment,

11   bargaining rights, and union representation rights. To the extent the CBA allows the union to

12   collect contributions, those payments come from the members, not the government, such that it

13   cannot be found to be a money-mandating contract. And as the Ninth Circuit has acknowledged,

14   "[a]n action for specific performance is not an action for "money damages" under APA § 702,

15   even if the remedy may actually require a payment of money by the government." Tucson, 136

16   F.3d at 645. Defendants fail to demonstrate that the APA and Tucker Act preclude jurisdiction.

17   **D.    Plaintiffs' APA Claim Is Reviewable**

18   Defendants argue the Noem Determination is not reviewable under the APA because it is

19   "committed to agency discretion by law" and therefore exempt under 5 U.S.C. § 701(a)(2).

20   (Defs. Opp. at 10-15.) The Court disagrees.

21   "The Administrative Procedure Act embodies a 'basic presumption of judicial review,'

22   Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and

23   instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of

24

1  discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A)." Dep't of Com. v.

2  New York, 588 U.S. 752, 771 (2019). "Most—but not all—final agency actions are reviewable,"

3  subject to two exceptions. Trout Unlimited v. Pirzadeh, 1 F.4th 738, 751 (9th Cir. 2021).

4  Defendants highlight one exception to APA's presumption of judicial review—for "agency

5  action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

6           The Supreme Court has "read the § 701(a)(2) exception for action committed to agency

7  discretion quite narrowly, restricting it to those rare circumstances where the relevant statute is

8  drawn so that a court would have no meaningful standard against which to judge the agency's

9  exercise of discretion." Dep't of Com., 588 U.S. at 772 (citation and quotation omitted). The

10 APA expressly contemplates judicial review of an agency's ordinary discretionary judgments by

11 authorizing review of an agency's action for "abuse of discretion." 5 U.S.C. § 706(2)(A). The

12 Section 701(a)(2) exception therefore applies only "if no judicially manageable standards are

13 available for judging how and when an agency should exercise its discretion." Trout Unlimited, 1

14 F.4th at 751 (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)). "Only where there is truly

15 no law to apply have we found an absence of meaningful standards of review." Perez Perez v.

16 Wolf, 943 F.3d 853, 861 (9th Cir. 2019) (internal quotation marks omitted). "So long as the

17 regulations provide a 'meaningful standard' by which a court could review the [agency's] actions

18 and our review of the agency's compliance with those regulations does not infring[e] any of the

19 [agency's] prerogatives under the statute, then we have jurisdiction, pursuant to the APA, to

20 review the agency's compliance with its own regulations." Trout Unlimited, 1 F.4th at 752

21 (citation and quotation omitted).

22          Judicially-manageable standards against which to measure agency action can derive from

23 a variety of sources, not just regulations and statutes. "In order to assess whether the court has a

24

1    meaningful standard against which to judge the agency's exercise of discretion[,] we first look at

2    the statute itself." ASSE Int'l, Inc. v. Kerry, 803 F.3d 1059, 1069 (9th Cir. 2015) (cleaned up).

3    The Court may also look to agency regulations or agency practices to determine a meaningful

4    standard against which to review its exercise of discretion. Id. at 1069 ("Even where statutory

5    language grants an agency unfettered discretion, its decision may nonetheless be reviewed if

6    regulations or agency practice provide a meaningful standard by which this court may review its

7    exercise of discretion."). Similarly, the Ninth Circuit has found that agency memoranda

8    implementing policies to provide a meaningful standard against which to test agency action.

9    Alcaraz v. I.N.S., 384 F.3d 1150, 1161 (9th Cir. 2004).

10         The Parties here agree that § 111(d) of the ATSA gives DHS broad discretion to

11   determine whether or not to engage in collective bargaining. (Mot. at 19; Reply at 8.)

12   Specifically, Section 111(d) gives the TSA Administrator authority to "employ, appoint,

13   discipline, terminate, and fix the compensation, terms, and conditions of employment of Federal

14   service" for security screeners. 49 U.S.C. § 44935. Nonetheless, Plaintiffs argue that the 2024

15   CBA offers sufficient agency policy standards against which to measure Noem's exercise of

16   discretion.

17         The Court agrees with Plaintiffs that the 2024 CBA is a "self-imposed restriction on

18   agency discretion" that provides a meaningful standard by which the Court may review Noem's

19   exercise of discretion. (Reply at 8.) The CBA also conferred a benefit to TSOs by allowing them

20   to collectively bargain, to have certain procedural rights. And the CBA allowed AFGE to act as a

21   representative for its TSO member in various proceedings. The outcome here is similar to that in

22   ASSE, 803 F.3d at 1069-70. There, the agency had full discretion to create—or not—an

23   exchange visitor programs, and once it adopted regulations creating such a program, it created a

24

1   judicially reviewable standard. Id. Here, although TSA has discretion in how it employs TSOs,

2   once it entered into the CBA, it set a policy and practice against which to measure Noem's

3   exercise of discretion and it conferred rights on TSOs that they would not have otherwise

4   enjoyed. And while the CBA here is not a regulation, it has the same force of one, as it is a

5   statement of policy and a practice, which the Ninth Circuit has found sufficient to form a legal

6   standard for review. See Alcaraz, 384 F.3d at 1161; ASSE, 803 F.3d at 1069. This follows the

7   Ninth Circuit's explanation in Trout Unlimited, that an agency determination made under broad

8   discretionary authority can nevertheless cabin agency discretion to make it reviewable under the

9   APA, much like the public duty doctrine—while "a person has no duty to undertake a rescue but,

10  once a rescue is attempted, the rescuer is held to a duty of care." Trout Unlimited, 1 F.4th at 756.

11        Defendants argue that the Noem Determination is unreviewable as a form of non-

12  enforcement decision that the Supreme Court has exempted from review. (See Defs. Opp. at 13

13  (citing Dep't of Homeland Sec. v. Regents of the Univ. of California, 591 U.S. 1 (2020)).) This is

14  not convincing. Defendants are correct that the Supreme Court has recognized a "limited

15  category of unreviewable actions [that] includes an agency's decision not to institute

16  enforcement proceedings[.]" Regents, 591 U.S. at 17 (citing Heckler, 470 U.S. at 831–32). For

17  example, in Heckler the Supreme Court recognized that the FDA's refusal to institute

18  enforcement actions against two States to prevent their use of certain drugs for lethal injunction

19  was beyond review because a "refusal to act" does not "provide[] a focus for judicial review." Id.

20  at 832. But the Supreme Court has since distinguished Heckler in considering DACA, finding the

21  immigration program to be not only a non-enforcement policy, but also one that conferred

22  various benefits to immigrants who fit within the program. Regents, 591 U.S. at 18-19 (noting

23  that "[u]nlike an agency's refusal to take requested enforcement action, access to these types of

24

1   benefits is an interest "courts often are called upon to protect" (cleaned up)). As explained in

2   Regents, an agency determination that includes both non-enforcement and which confers benefits

3   falls within APA review. Here, like the DACA program in Regents, the CBA confers benefits on

4   TSOs and the Union, set a policy of engaging in collective bargaining for the agency itself, and

5   ultimately set a meaningful standard against which to assess the Noem Determination under the

6   APA. As such, the Court rejects Defendants' argument that CBA is akin to a non-enforcement

7   policy that cannot be reviewed.

8          Defendants further argue that the Noem Determination is not reviewable under the APA

9   because it does not have the force and effect of law. (Defs. Opp. at 18 (citing W. Radio Servs.

10  Co. v. Espy, 79 F.3d 896, 901-02 (9th Cir. 1996)).) This case does not support the point. In Espy

11  the Ninth Circuit explained that a court "will not review allegations of noncompliance with an

12  agency statement that is not binding on the agency." 79 F.3d at 900. To have the independent

13  force and effect law "'the agency pronouncement must (1) prescribe substantive rules—not

14  interpretive rules, general statements of policy or rules of agency organization, procedure or

15  practice—and, (2) conform to certain procedural requirements.'" Id. at 901 (quoting United

16  States v. Fifty-Three Eclectus Parrots, 685 F.2d 1131, 1136 (9th Cir. 1982)). "'To satisfy the first

17  requirement the rule must be legislative in nature, affecting individual rights and obligations; to

18  satisfy the second, it must have been promulgated pursuant to a specific statutory grant of

19  authority and in conformance with the procedural requirements imposed by Congress.'" Id.

20  (quoting Parrots, 685 F.2d at 1136). In Espy, the Court found that a manual and handbook from

21  the U.S. Forest Service did not have the independent force and effect of law because it was not

22  substantive and were not promulgated in accordance with the APA's notice and comment rules.

23  But here, the Noem Determination satisfies both elements set forth in Espy. The CBA is

24

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION - 24

1  substantive because it sets forth rules that "affect[] individual rights and obligations" and the

2  TSA Administrator was given the authority to do so under ATSA § 111(d). And any notice and

3  comment requirement of the APA does not apply, because the CBA adoption and 2022

4  Determination relate to agency management or personnel, which are carved out by 5 U.S.C. §

5  553(a)(2). Defendants' argument thus misses the mark.

6  **E.    Preliminary Injunction Must Issue**

7          **1.    Legal Standard**

8          "A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed

9  on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3)

10 the balance of equities tips in her favor, and (4) an injunction is in the public interest." Farris v.

11 Seabrook, 677 F.3d 858, 864 (9th Cir. 2012) (citing Winter v. NRDC, 555 U.S. 7, 20 (2008)). A

12 preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear

13 showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22. And it is "never

14 awarded as of right." Id. In each case, the Court "must balance the competing claims of injury

15 and must consider the effect on each party of the granting or withholding of the requested relief."

16 Id.

17         The Ninth Circuit applies a "sliding scale" approach in considering the factors outlined in

18 Winter. A stronger showing of one element may offset a weaker showing of another. All. for the

19 Wild Rockies v. Cottrell, 632 F.3d 1127, 1131–32 (9th Cir. 2011). So "when the balance of

20 hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious

21 questions going to the merits.'" hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 992 (9th Cir.

22 2019) (quoting All. for the Wild Rockies, 632 F.3d at 1135).

23

24

1   In considering the likelihood of success on the merits, the Court is not strictly bound by

2   the rules of evidence, as the "preliminary injunction is customarily granted on the basis of

3   procedures that are less formal and evidence that is less complete than in a trial on the merits."

4   Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981). Because of the extraordinary nature of

5   injunctive relief, including the potential for irreparable injury if not granted, a court may consider

6   evidence outside the normal rules of evidence, including: hearsay, exhibits, declarations, and

7   pleadings. Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009). "[I]n the First Amendment

8   context, the moving party bears the initial burden of making a colorable claim that its First

9   Amendment rights have been infringed . . . at which point the burden shifts to the government to

10  justify the restriction." Thalheimer v. City of San Diego, 645 F.3d 1109, 1115–16 (9th Cir.

11  2011).

12          **2.      Plaintiffs Seek a Prohibitory Injunction, Not a Mandatory Injunction**

13          Defendants argue that Plaintiffs are seeking a mandatory injunction, subject to heightened

14  pleading standards. Defendants are incorrect

15           "[A] mandatory injunction as one that goes beyond simply maintaining the status quo

16  and orders the responsible party to take action pending the determination of the case on its

17  merits." Doe v. Snyder, 28 F.4th 103, 111 (9th Cir. 2022). The standard for issuing a mandatory

18  injunction is high. "In general, mandatory injunctions are not granted unless extreme or very

19  serious damage will result and are not issued in doubtful cases or where the injury complained of

20  is capable of compensation in damages." Id. (citation and omitted). But a preliminary injunction

21  which merely seeks to preserve the status quo, is not considered a mandatory injunction. In Doe,

22  the Ninth Circuit found a mandatory injunction because the relief sought through the injunction

23  was the payment for gender reaffirming surgery. The Court explained that "rather than maintain

24

the status quo <u>pendente lite</u>, Plaintiffs sought to compel Defendant to act prior to the entry of a final judgment." <u>Id.</u>

Plaintiffs here seek only a prohibitory injunction. They ask the Court merely to stop the Noem Determination's rescission of the CBA and 2022 Determination. Granting that relief would simply keep the CBA in effect, as it was intended when it was executed. This is far different than requiring the Defendants to undertake some separate act that it would not have had to take if the CBA stayed in effect. It is unlike the requested payment for surgery in the <u>Doe</u> case, because those payments were seen as novel, affirmative acts that were not part of the status quo. It is also far afield of Ninth Circuit decision finding a mandatory injunction where a coach sought an injunction that would have extended her then-terminated contract beyond its term and at a higher wage. <u>Stanley v. Univ. of S. Cal.</u>, 13 F.3d 1313, 1320 (9th Cir. 1994). Here, Plaintiffs only ask for preservation of the status quo, which is "the 'last, uncontested status which preceded the pending controversy.'" <u>Doe v. Bd. of Trs. of Whitman Coll.</u>, 670 F. Supp. 3d 1155, 1162 (E.D. Wash. 2023) (quoting <u>Doe v. Samuel Merritt Univ.</u>, 921 F. Supp. 2d 958, 962-63 (N.D.Cal. 2013)). No heightened standard applies.

### 3.    Likelihood of Success

The Court reviews the likelihood of success of all three of Plaintiffs' claims.

#### a.    APA

Plaintiffs pursue two APA claims. The first asserts the Noem Determination is arbitrary and capricious, while the second asserts it is contrary to law.

#### <u>Arbitrary and Capricious</u>

Plaintiffs possess a strong claim that the Noem Determination is arbitrary and capricious.

Agency actions are arbitrary and capricious when the explanation "'runs counter to the evidence before the agency.'" <u>Organized Vill. of Kake v. USDA</u>, 795 F.3d 956, 966 (9th Cir.

1    2015) (en banc) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.

2    Ins. Co., 463 U.S. 29, 43 (1983)). "'Unexplained inconsistency' between agency actions is 'a

3    reason for holding an interpretation to be an arbitrary and capricious change.'" Id. (quoting Nat'l

4    Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005)). And "when

5    an agency rescinds a prior policy[,] its reasoned analysis must consider the alternatives that are

6    within the ambit of the existing policy." Regents, 591 U.S. at 30 (cleaned up).

7         With regard to changes in agency positions, no heightened standard applies. See FCC v.

8    Fox Television Stations, Inc., 556 U.S. 502, 514 (2009). But where an agency announces the

9    "rescission of a prior regulation . . . such action requires 'a reasoned analysis for the change

10   beyond that which may be required when an agency does not act in the first instance.'" Id.

11   (quoting Motor Vehicle, 463 U.S. at 42). "[T]he requirement that an agency provide reasoned

12   explanation for its action would ordinarily demand that it display awareness that it is changing

13   position." Id. at 515. "But [the agency] need not demonstrate to a court's satisfaction that the

14   reasons for the new policy are better than the reasons for the old one; it suffices that the new

15   policy is permissible under the statute, that there are good reasons for it, and that the agency

16   believes it to be better, which the conscious change of course adequately indicates." Id. That

17   said, "[a]n agency may not, for example, depart from a prior policy sub silentio or simply

18   disregard rules that are still on the books." Id. "And of course the agency must show that there

19   are good reasons for the new policy." Id. "Sometimes it must—when, for example, its new

20   policy rests upon factual findings that contradict those which underlay its prior policy; or when

21   its prior policy has engendered serious reliance interests that must be taken into account." Id.

22   "[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or

23   were engendered by the prior policy." Id. at 516.

24

As Plaintiffs correctly point out, the Noem Determination here fails to put forward a reasoned explanation for the 180-degree departure from prior DHS/TSA policy embracing collective bargaining for TSOs. This can be seen by comparing the prior Determinations to the Noem Determination.

The 2011 Determination reflects the Administrator's "careful thought to the question of union representation for TSOs" and the desire to "do better with and by our employees to ensure we continue accomplish our mission." (2011 Determination at 1.) The Administrator noted that survey data showed week "employee morale and engagement" and that "employee engagement and security are interrelated, and therefore directly affect [TSA's] capacity to effectively carry out [its] mission." (Id.) The then-Administrator's considered "workforce data," opinions from "others in the security and law enforcement fields, and . . . many views in the context of considering TSA's mission requirements, now and in the further, and the security and confidence of the traveling public." (2011 Determination at 2.) The Administrator found that "union representation . . . within a framework that protects TSA's security mission . . . is important not just for morale; engagement of every employee is critically important for security." (Id. at 3.) The Administrator also recognized that collective bargaining could help "support our workforce and ensure consistency and accountability without our far flung operations across nearly 450 airports." (Id. at 4.)

In the 2022 Determination, TSA Administrator built on the 2011 Determination, explaining further that his Determination was consistent with Executive Orders to "support . . . worker power, worker organizing, and collective bargaining" and to "recogniz[e] that TSA's dedicated employees are critical to the success of our mission." (2022 Determination at 1.) The Determination explained that it was intended to expand "collective bargaining … to more closely

1    mirror the rights and benefits that are provided to bargaining unit employees under Chapter 71 of

2    Title 5 of the United States Code" and "permit collective bargaining at the national level to the

3    same extent as permitted under Chapter 71 of Title 5, U.S. Code." (2022 Determination at 1 n.2.)

4        The 2024 CBA itself buttresses the 2011 and 2022 Determinations that unionized TSOs

5    further the security mission of the TSA. The CBA recognizes that "the labor management

6    relationship must be built on a solid foundation of trust and mutual respect, promote a quality

7    work environment for all employees, and enable successful performance of TSA's mission."

8    (CBA Art. 1.) The CBA further recognized that "bargaining unit employees are essential to

9    achieving the Agency's critical security mission and that a cooperative working relationship

10   between labor and management plays a vital role in the success of the bargaining unit

11   employees." (Id.) The CBA also "recognize[d] the Agency's critical work as a security agency"

12   and gave it flexibility to engage in post-implementation bargaining for any security reasons or

13   others deemed necessary by the Administrator. (CBA Art. 13(D)(2).)

14       The Noem Determination rejects the prior Determinations with little explanation. In her

15   Determination, Noem explains that Congress "explicitly excluded TSOs from the parts of the

16   Civil Service Reform Act that authorize and regulate collective bargaining," and that this was

17   "[c]onsistent with a flexible, at-will workforce." (Noem Determination at 2.) Noem also

18   recognized that TSA had embraced limited collective bargaining and exclusive representation in

19   2011 that was then "substantially expanded" under the 2022 Determination. (Id.) As a reason for

20   her new Determination, Noem claims that "[t]hese misplaced directives have solely benefited the

21   American Federation of Government Employees (AFGE) at TSOs' expense, impeded

22   Congressional intent of a flexible workforce, and failed to serve TSA's critical mission to protect

23   the transportation system and keep Americans safe." (Id.) In support of her claim that only

24

1    AFGE has benefitted, she cites the "nearly $15M is annually deducted from TSOs' paychecks."

2    (Id.) She claims her Determination purports to be consistent with other Executive Orders the

3    Trump Administration issued about the federal workforce and CBAs. And Noem states that "I

4    am issuing this Determination to ensure that TSOs critical national security responsibilities are

5    carried out to 'maximize governmental efficiency and productivity.'" (Id. at 3.)

6            There are several reasons why the Noem Determination appears to be arbitrary and

7    capricious. First, Noem has not explained why collective bargaining has threatened the safety of

8    the transportation system or travelers in America. Such an explanation is particularly needed

9    here, given the prior positions taken by TSA as to why collective bargaining benefits overall

10   traveler safety and furthers TSA's congressionally-mandated safety mission.

11           Second, Noem does not explain how the CBA has "benefited the   . . . AFGE at the

12   TSOs' expense." As AFGE points out, membership is entirely voluntary. Noem also fails to

13   acknowledge that TSOs who join the union enjoy benefits from the Union in collective

14   bargaining over wages, employment protections, and representation in disputes concerning

15   employment. This undermines her purported rationale, as the CBA does not just benefit AFGE.

16           Third, Noem's claim that Congress intended for TSOs to be at-will employees is far from

17   convincing. Noem relies on the following phrase from a note in the ATSA: "notwithstanding any

18   other provision of law," the TSA Administrator "may employ, appoint, discipline, terminate, and

19   fix the compensation, terms, and conditions of employment of Federal service" for security

20   screeners. 49 U.S.C. § 44935, note. Citing a Federal Circuit opinion finding the

21   "notwithstanding" language to exempt "general federal statutes," Noem believes Congress

22   intended to exclude TSOs from collective bargaining (Noem Determination at 2 n.3 (citing 49

23   U.S.C. § 44935, note; Conyers v. Merit Sys. Prot. Bd., 388 F.3d 1380, 1382 (Fed. Cir. 2004)).)

24

1    But the mere fact that Congress did not require collective bargaining in the first instance and

2    simply gave the TSA discretion is not evidence that it intended TSOs to always be at-will

3    employees without bargaining rights. The statutory note merely indicates that that the TSA

4    Administrator should have the flexibility to set employment terms, not that it should prevent

5    collective bargaining. The Court also notes that it appears that since 2011, no one has challenged

6    the TSA's decision to allow collective bargaining and no court has found that collective

7    bargaining runs contrary to Congress's intent in creating the ATSA. While not dispositive, this

8    further undermines Noem's rationale.

9         Third, the Noem Determination fails to explain why the prior Determinations'

10   conclusions about the merits of the CBA are no longer valid or that circumstances have changed.

11   As the Supreme Court explained, "[s]ometimes [an agency] must. . . provide a more detailed

12   justification . . . when, for example, its new policy rests upon factual findings that contradict

13   those which underlay its prior policy; or when its prior policy has engendered serious reliance

14   interests that must be taken into account." <u>Fox</u>, 556 U.S. at 515. And "a reasoned explanation is

15   needed for disregarding facts and circumstances that underlay or were engendered by the prior

16   policy." <u>Id.</u> at 516. Additionally,  "[w]hen an agency changes course, as DHS did here, it must be

17   cognizant that longstanding policies may have engendered serious reliance interests that must be

18   taken into account." <u>Regents</u>, 591 U.S. at 30 (internal quotations omitted). Here, there is no

19   acknowledgement of the prior facts and circumstances that underlaid the 2011 and 2022

20   Determinations or the 2024 CBA. Similarly, Noem has failed to provide any detailed

21   justification for the abrupt departure that affects thousands of TSOs who claim reliance on the

22   CBA and its benefits. This includes the 37 pending arbitrations and 199 pending grievances that

23

24

were terminated by the Noem Determination. (<u>See</u> Declaration of Anthony Vicenzo ¶¶ 4, 6 (Dkt. No. 27).)

Defendants' argument that the Noem Determination is simply an unremarkable disagreement between the Trump and Biden Administration does not save the agency action here. It also does not pay any heed to the substantial and factually-supported reasons why TSA allowed collective bargaining in the first instance. As explained above, the Noem Determination appears arbitrary and capricious, and it appears likely to violate the APA.

**<u>Contrary to Law</u>**

Plaintiffs argue that the Noem Determination is contrary to law because it represents a refusal to comply with self-imposed limitations in violation of 5 U.S.C § 706((2)(A), (C). Plaintiffs note that the CBA states that it was to "remain in full force and effect" for seven years and that it could only be changed "upon mutual written consent of the parties." CBA Arts. 13(A)(3), 37(B)(1). The Court finds a likelihood of success on the merits, as it would appear clear that the Noem Determination runs contrary to the express terms of the CBA, which provides for a specific duration and requires mutual consent to any changes. Defendants do little to oppose the merits of the claim, and instead argue that the claim cannot proceed because the CBA lacks the force of law. (Def. Opp. at 18 (citing <u>Espy</u>).) But as the Court explains above, the CBA does have the force and effect of law, which undermines fully Defendants' argument. (<u>See</u> Analysis Section C, <u>supra</u>.) Plaintiffs are likely to succeed on this iteration of their APA claim.

### b.    First Amendment Retaliation

To state a claim for First Amendment retaliation, the Plaintiff must show "that (1) [the plaintiff] was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." <u>O'Brien v.</u>

1    Welty, 818 F.3d 920, 932 (9th Cir. 2016) (internal quotations omitted). "If an official takes

2    adverse action against someone based on that forbidden motive, and non-retaliatory grounds are

3    in fact insufficient to provoke the adverse consequences, the injured person may generally seek

4    relief by bringing a First Amendment claim." Nieves v. Bartlett, 587 U.S. 391, 398 (2019)

5    (quotation omitted).

6         Plaintiffs have a strong First Amendment retaliation claim, and Defendants only

7    challenge the question of animus. As to the first undisputed element, it is apparent that AFGE

8    has been involved in at least three lawsuits against the Trump Administration to stop Trump's

9    efforts to downsize the federal workforce. See, e.g., AFGE v. Trump, No. 1:25-cv-00264

10   (D.D.C.); AFGE v. Ezell, No. 1:25-cv-10276 (D. Mass.); AFGE v. OPM, No. 3:25-cv-01780

11   (N.D. Cal.). As to the second element, a person of ordinary firmness would reasonably be

12   deterred from engaging in further litigation if he or she feared loss of job-related benefits.

13        As to animus, there is strong evidence that the Noem Determination comes from the

14   Trump Administration's dislike for AFGE as a union pushing back against its federal

15   employment policies. The Noem Determination attacks AFGE by name, stating the prior

16   Determinations and CBA "have solely benefited the . . . AFGE[] at TSOs' expense." (Noem

17   Determination at 2.) This statement mischaracterizes the CBA and further highlights a direct

18   antipathy towards AFGE. It is simply not true that the AFGE has solely benefitted from the CBA

19   or that the CBA has come at TSOs' expense. The Noem Determination also follows closely

20   AFGE's litigation efforts to push back against the Trump Administration's attacks on federal

21   workers. Plaintiffs highlight that on February 27, 2025 (the same day of the Noem

22   Determination), a district court issued a temporary restraining order against the Office of

23   Personnel Management, in favor of AFGE. AFGE v. OPM, 2025 WL 660053, at *14 (N.D. Cal.

24

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION - 34

Feb. 28, 2025) (referencing Feb. 27 oral order). Plaintiffs also note that President Trump issued a memorandum for agency heads targeting litigants like AFGE, stating "[i]n recent weeks, activist organizations . . . have obtained sweeping injunctions . . . undermining the democratic process." See March 2025 Fact Sheet. And the White House has issued a "Fact Sheet," identifying "[t]he largest Federal union" (which is AFGE) and claiming that it has "declared war on President Trump's agenda." March 27 Fact Sheet. While these White House directives post-date the Noem Determination, Noem invoked the Administration anti-union Executive Orders as motivating her own determination. And the Trump Administration has treated other unions who have not challenged his actions more favorably—a fact that further shows animus against AFGE. While those acts are not directly tied to Noem, they are nevertheless relevant to assessing animus in the context of executive branch actions and a pattern of ongoing retaliation. See Adetuyi v. City of San Francisco, 63 F.Supp.3d 1073, 1090 (N.D. Cal. 2014). And they are not merely coincidental—they fall within a pattern of specific hostility directed towards AFGE. A jury could likely find this sufficient to show animus to support the claim, and the Court finds it likely to succeed.

### c.    Due Process

Plaintiffs argue that they were denied Fifth Amendment Due Process when Noem rescinded the CBA and all outstanding grievances without notice or process. The Court finds Plaintiffs likely to succeed on this claim.

In order to have a Fifth Amendment claim, Plaintiffs must demonstrate a constitutionally-protected property interest. "[I]t has long been settled that a contract can create a constitutionally protected property interest." San Bernardino Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cnty., 825 F.2d 1404, 1407–08 (9th Cir. 1987). A "constitutionally protectible entitlement may arise from contractual language providing for discharge from employment only

1    for 'cause,' or even from the mere fact that a contract provides for continued employment during

2    a fixed term." Id. (citation omitted). But not every contract provision creates an enforceable

3    right. In order to have a property interest in a benefit, a person must demonstrate that he or she

4    has a legitimate claim of entitlement to it, not merely a unilateral expectation. Board of Regents

5    of State Colleges v. Roth, 408 U.S. 564, 577 (1972).

6          Here, Plaintiffs reasonably argue that the CBA provides a legitimate entitlement to

7    certain rights in "their continued employment at TSA" and that this conferred a constitutionally-

8    protected right. (Mot. at 22.) Plaintiffs note that under the CBA, "Disciplinary and/or Adverse

9    Actions may be taken for just cause and only for reasons that will promote the efficiency of the

10   service." (2024 CBA Art. 27(C)(3).) The Court agrees with Plaintiffs that this does confer an

11   entitlement that has been affected by the termination of the CBA without any process. See San

12   Bernardino, 825 F.2d at 1408. Additionally, Plaintiffs have also identified a right to file

13   grievances, which confers an entitlement to benefits that are more than a unilateral expectation.

14   Plaintiffs have also explained that they were not afforded any process before deprivation.

15   Defendants provided no notice before termination of the CBA or the grievances. Plaintiffs are

16   likely to succeed on the merits of this claim.

17         The Court also notes that the sole case Defendants cite remains distinguishable in

18   material aspects. Ortloff v. Trimmer, No. C16-1257RSL, 2018 WL 2411755, at *3 (W.D. Wash.

19   May 29, 2018), aff'd, 773 F. App'x 903 (9th Cir. 2019). Ortloff concerned probationary

20   employees who were required by a collective bargaining agreement to be given "bona fide

21   reasons" for termination before the end of the probationary period. Id. The Court found that

22   probationary employees had no protected right because the agreement imposed only a

23   "reasonableness" or "good faith" standard and it did not confer an interest in continued

24

1  employment. Here, the CBA confers specific rights affecting the terms of employment, imposes

2  a "just cause" basis for termination, and gives members the right to file grievances, far beyond

3  the limited standards at issue in Ortloff.

4  **4.    Irreparable Harm**

5  The Court finds irreparable harm in the absence of a preliminary injunction. As Plaintiffs

6  explain, without the CBA, AFGE members will lose the protections and benefits of the CBA and

7  bargaining power, while AFGE will lose union dues and the ability to retain and attract new

8  member. While the loss of money alone does not show irreparable harm, the total harms here are

9  more than monetary. They include the loss of substantive employment protections, avenues of

10  grievance and arbitration, and the right to have a workforce that can unite to demand benefits

11  that might not be obtainable through individual negotiation. It also includes the loss of pending

12  grievances and arbitrations commenced under the CBA. And AFGE attests that it will have

13  difficulty recruiting new members. (Glymph Decl. ¶ 43.) Those harms are irreparable. Moreover,

14  the Noem Determination's chilling of Plaintiffs' First Amendment rights pose an independent,

15  irreparable harm. See Elrod v. Burns, 427 U.S. 347, 373 (1976).

16  **5.    Balance of Hardships and Public Interest**

17  The Court finds the balance of hardships and the public interest weigh in favor of an

18  injunction. The Noem Determination affect tens of thousands of TSOs and the Union itself, and

19  it implicates core constitutionally-protected rights. The hardship here clearly falls on AFGE and

20  its TSOs members. The public interest here also favors Plaintiffs, given the constitutional rights

21  at issue and the apparent violations of the APA. In response, Defendants argue that an injunction

22  would frustrate Noem's efforts to operate TSA effectively and efficiently. But these claimed

23  needs for efficiency cannot trump constitutional rights, and the Court finds little persuasive

24

1    power in this rhetoric. The need to vindicate constitutional rights serves the public's interest in

2    maintaining the rule of law even when it might be at odds with executive priorities. And while

3    the TSA Administrator has the authority to regulate employees, it does not have carte blanche to

4    do so in a way that violates the law.

5    **F.    Bond**

6         The Parties here agree that a bond should issue, as Plaintiffs specifically asked the Court

7    issue a bond at oral argument. The Parties dispute the amount of the bond. Plaintiffs ask for a

8    nominal bond, while Defendants cite millions of dollars they believe they will have to spend if

9    the CBA returns to force.

10        Under Rule 65(c), "[t]he court may issue a preliminary injunction or a temporary

11   restraining order only if the movant gives security in an amount that the court considers proper to

12   pay the costs and damages sustained by any party found to have been wrongfully enjoined or

13   restrained."

14        The Court finds that only a nominal bond here is necessary. The costs Defendants cite are

15   not in the record before the Court, which undermines Defendants' request. And based on the

16   arguments of counsel, the costs appear to be those TSA would likely have to pay regardless of

17   the existence of the CBA. Without such evidence, and in consideration of the relative position of

18   the parties and the nature of the claims, the Court finds a nominal bond is necessary. The Court

19   therefore directs Plaintiffs to give security in the amount of a $100 bond within 3 days of entry of

20   this Order.

21   **G.    No Amicus Brief**

22        Americans for Fair Treatment has asked for leave to appear as <u>Amicus Curiae</u> and to file

23   a brief in support of Defendants. (Dkt. No. 29.) The Court DENIES the Motion.

24

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION - 38

1       District courts have broad discretion to admit amicus briefing. Hoptowit v. Ray, 682 F.2d

2  1237, 1260 (9th Cir. 1982), abrogated on other grounds by Sandin v. Conner, 515 U.S. 472

3  (1995). The "classic role" of amicus curiae has been to "assist[ ] in a case of general public

4  interest, supplementing the efforts of counsel, and drawing the court's attention to law that

5  escaped consideration." Miller-Wohl Co., Inc. v. Comm'r of Labor & Indus. State of Mont., 694

6  F.2d 203, 204 (9th Cir. 1982). There are no strict prerequisites to qualify as amici, although

7  amicus must "'make a showing that his participation is useful to or otherwise desirable to the

8  court.'" In re Roxford Foods Litig., 790 F. Supp. 987, 997 (E.D. Cal. 1991) (quoting United

9  States v. Louisiana, 751 F. Supp. 608, 620 (E.D. La. 1990)).

10       The Court here finds that the proposed amicus brief is not necessary or appropriate, given

11  that Defendants are well represented by counsel and the proposed amicus brief does not identify

12  any unique information or perspective that will aid the Court in resolving this matter.

13  Accordingly, the Court DENIES the Motion. (Dkt. No. 29.)

**CONCLUSION**

15       Plaintiffs have convincingly demonstrated they are likely to succeed on the merits of their

16  claims showing that the Noem Determination violates the First and Fifth Amendments and the

17  APA. The Noem Determination appears to have been undertaken to punish AFGE and its

18  members because AFGE has chosen to push back against the Trump Administration's attacks to

19  federal employment in the courts. The First Amendment protects against retaliation for engaging

20  in litigation and public criticism of the government. And the Noem Determination's threadbare

21  justification for termination of the CBA exposes the retaliatory nature of the decision. Her

22  determination also appears arbitrary and capricious. Without engaging at all in the prior

23  Determination's studied conclusion that collective bargaining builds greater air travel safety,

1    Noem arrived at a conclusion at odds with more than a decade of consistent agency belief that

2    collective bargaining benefits TSOs, TSA, and the public. Such an action appears to violate the

3    APA. And Noem's rescission of the CBA without any process likely violates Due Process, as

4    guaranteed under the Fifth Amendment.

5         Because Plaintiffs have shown a strong likelihood of success on their claims, that they

6    face irreparable harm without an injunction, and that the balance of hardships and public interest

7    favor their position, the Court GRANTS the Motion for Preliminary Injunction. The Court

8    ORDERS as follows:

9         Defendants and all their respective officers, agents, servants, employees, and attorneys

10   are hereby enjoined from the following:

11        1.      Enforcing, implementing, or otherwise giving effect to the Noem Determination's

12   purported recission of the 2024 CBA between TSA and AFGE and/or its determination that the

13   2024 CBA is no longer applicable or binding;

14        2.      Denying Plaintiffs, their members, and all bargaining unit TSOs any and all rights

15   and/or working conditions guaranteed in the 2024 CBA; and

16        3.      Enforcing or implementing the Noem Determination's termination of functions,

17   processes, and obligations arising out of the 2024 CBA, including but not limited to the

18   termination of pending grievances and arbitrations brought pursuant to the 2024 CBA.

19        Additionally, the Court ORDERS Defendants to immediately notify bargaining unit

20   TSOs that pursuant to this Order, the 2024 CBA remains applicable and binding, such that all

21   rights contained in the CBA are restored to the pre-Noem Determination status quo, including

22   but not limited to the right of AFGE to serve as exclusive representative, the right of TSOs to

23   request representation in connection with an investigation, the right of TSOs to pay their

24

membership dues through payroll deduction (such that payroll deduction of dues will be restarted

for TSOs who have previously requested it), the right to use official time as set forth in the CBA,

contractual protections regarding discipline and adverse actions, and the right to use the

contractual grievance and arbitration process. Furthermore, Defendants must notify bargaining

unit TSOs that pursuant to this order, currently pending grievances and arbitrations submitted

pursuant to the 2024 CBA will continue to be processed.

The clerk is ordered to provide copies of this order to all counsel.

Dated June 2, 2025.

Marsha J. Pechman
United States Senior District Judge