1

2
Judge Pechman

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

8

9
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO;

CASE NO. 2:25-cv-451-MJP

10
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO TSA

**PLAINTIFFS' NOTICE OF**
**SUPPLEMENTAL AUTHORITY**

11
LOCAL 1121; COMMUNICATIONS
WORKERS OF AMERICA, AFL-CIO; and

12
ASSOCIATION OF FLIGHT ATTENDANTS-
CWA, AFL-CIO,

13
        Plaintiffs,

14

15
    v.

16
KRISTI NOEM, in her official capacity as
Secretary of Homeland Security; U.S.

17
DEPARTMENT OF HOMELAND SECURITY;
HA NGUYEN McNEILL, in her official

18
capacity as Acting Administrator of the
Transportation Security Administration; and

19
TRANSPORTATION SECURITY
ADMINISTRATION,

20
        Defendants.

21

22

23

24

NOTICE OF SUPPLEMENTAL AUTHORITY – i
CASE NO. 2:25-cv-451-MJP

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

Pursuant to Local Civil Rule 7(n), Plaintiffs provide this Notice of Supplemental Authority informing the Court of a relevant recent judicial decision.

On June 24, 2025, the United States District Court for the Northern District of California issued a preliminary injunction order in *American Federation of Government Employees, et al. v. Trump, et al.*, No. 3:25-cv-03070-JD (N.D. Cal.). Relevant here, the order held that plaintiffs' claims challenging an Executive Order which purported to exclude them from federal sector labor law protections were not channeled to the Federal Labor Relations Authority, Order at 15-17, and granted a preliminary injunction based on plaintiffs' First Amendment retaliation claim, Order at 17-26. A copy of the June 24, 2025 Order is attached.

Respectfully submitted,

Date: June 26, 2025

*/s/Robert H. Lavitt*
Robert H. Lavitt, WSBA No. 27758
Barnard Iglitzin & Lavitt LLP
18 W Mercer St, Suite 400
Seattle, WA 98119
(206) 257-6004
lavitt@workerlaw.com

Abigail V. Carter*
J. Alexander Rowell*
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, N.W. Suite 1000
Washington, D.C. 20005
(202) 842-2600
(202) 842-1888 (fax)
acarter@bredhoff.com
arowell@bredhoff.com

Norman L. Eisen*
Pooja Chaudhuri*
Taryn Wilgus Null*
State Democracy Defenders Fund

NOTICE OF SUPPLEMENTAL AUTHORITY – 1
CASE NO. 2:25-cv-451-MJP

600 Pennsylvania Avenue SE, Suite 15180
Washington, D.C. 20003
(202) 594-9958
Norman@statedemocracydefenders.org
pooja@ statedemocracydefenders.org
Taryn@statedemocracydefenders.org

*Admitted pro hac vice*

*Counsel for Plaintiffs*

Rushab B. Sanghvi*
Andres M. Grajales*
American Federation Of
Government Employees, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
(202) 639-6426
SanghR@afge.org
Grajaa@afge.org

*Admitted pro hac vice*

*Counsel for Plaintiff American Federation
of Government Employees (AFGE)*

NOTICE OF SUPPLEMENTAL AUTHORITY – 2
CASE NO. 2:25-cv-451-MJP

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

1

2

3

4

5

6                        UNITED STATES DISTRICT COURT

7                       NORTHERN DISTRICT OF CALIFORNIA

8

9   AMERICAN FEDERATION OF                Case No.  25-cv-03070-JD
    GOVERNMENT EMPLOYEES, AFL-CIO,
10  et al.,
                                          ORDER RE PRELIMINARY
11              Plaintiffs,                INJUNCTION

12         v.

13  DONALD J. TRUMP, et al.,

14              Defendants.

15         For more than 60 years, Americans who worked for the federal government as civil

16  servants have had the right to unionize and collectively bargain for the conditions of their

17  employment.  These rights were first granted to federal employees in a series of executive orders

18  beginning in 1962, and then codified when Congress enacted the Federal Service-Labor

19  Management Relations Statute (FSLMRS), 5 U.S.C. §§ 7101 *et seq*., in 1978.

20         This long-standing status quo changed abruptly on March 27, 2025, when President Trump

21  issued Executive Order 14251, *Exclusions from Federal Labor-Management Relations Programs*,

22  90 Fed. Reg. 14553 (Apr. 3, 2025).  The order excluded an unprecedented number of federal

23  employees from the coverage of the FSLMRS.  The ostensible basis of the exclusion was Section

24  7103(b)(1) of the FSLMRS, which allows the President to exclude an agency or subdivision from

25  the FSLMRS upon a determination that "(A) the agency or subdivision has as a primary function

26  intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of

27  this chapter cannot be applied to that agency or subdivision in a manner consistent with national

28  security requirements and considerations."  5 U.S.C. § 7103(b)(1).  The Executive Order invoked

United States District Court
Northern District of California

the national security exception to exclude over 40 cabinet departments, agencies, and subdivisions across the federal government from the guarantee of collective bargaining rights under the FSLMRS.  The agencies determined to have national security and intelligence as a primary function included the National Institute of Allergy and Infectious Diseases, the Animal and Plant Health Inspection Service, the General Services Administration, the Office of the General Counsel of the Department of Health and Human Services, the Office of the Chief Information Officer of the Social Security Administration, and many others.  *See* 90 Fed. Reg. 14553-54.

A White House "Fact Sheet" published with the Executive Order provided additional context for the exclusions.  Dkt. No. 15-22, Ex. 3.  It took an expansive view of national security to include healthcare, energy production, and "protecting America's economic and productive strength," among other concerns.  *Id*. at 1-2.  It also called out "hostile Federal unions" and "[c]ertain Federal unions" who "have declared war on President Trump's agenda" and who are "'fighting back' against Trump."  *Id*. at 2-3.  The Fact Sheet stated that "President Trump supports constructive partnerships with unions who work with him" but "will not tolerate" unions who oppose his agenda.  *Id*. at 3.

Plaintiffs are six unions who appear to have been deemed hostile to the President.  They represent over a million federal employees working throughout the government.  They allege that the exclusion order violated their First Amendment rights and constituted an ultra vires act in excess of the President's express and implied authority under the statute.  They sued the President, dozens of federal departments and agencies that are subject to the exclusion order, and the heads of those departments and agencies.

Plaintiffs ask to preliminarily enjoin enforcement of the Executive Order pending the resolution of the merits of their claims on a fully developed record.  *See* Dkt. No. 15-1.  There is no doubt that an injunction is an extraordinary remedy that should not be ordered lightly.  It is also true that the Executive Branch's factual judgments bearing on national security are entitled to deference and significant weight.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).  Even so, the federal courts "do not defer to the Government's reading of the First Amendment," including when national security interests are said to be at stake.  *Id.* at 34.

United States District Court
Northern District of California

2

United States District Court
Northern District of California

Plaintiffs have raised serious questions under the First Amendment that warrant further litigation. Plaintiffs have also demonstrated a strong likelihood of irreparable harm from the loss of their collective bargaining and allied rights under the FSLMRS, that the balance of hardships tips sharply in their favor, and that an injunction would be in the public interest.  Consequently, enforcement of the Executive Order against plaintiffs is enjoined to preserve the status quo until trial.  An expedited trial date will be set in a separate order.[1]

## BACKGROUND

## I.     THE FEDERAL SERVICE-LABOR MANAGEMENT RELATIONS STATUTE

In 1962, President John F. Kennedy signed Executive Order 10988, which established collective bargaining rights for most federal employees.  *See* Exec. Order No. 10988, *Employee-Management Cooperation in the Federal Service*, 27 Fed. Reg. 551, 551 (Jan. 19, 1962).  The order was based on the finding that "the efficient administration of the Government and well-being of employees require that orderly and constructive relationships be maintained between employee organizations and management officials" and "participation of employees in the formulation and implementation of personnel policies affecting them contributes to the effective conduct of public business."  *Id.* at 551.  In 1978, Congress enacted the Federal Service Labor-Management Relations Statute (FSLMRS), Pub. L. No. 95-454, 92 Stat. 1111 (1978) (codified at 5 U.S.C. §§ 7101 *et seq.*), to "govern labor relations between the executive branch and its employees."  *Am. Fed'n of Gov't Emp., AFL-CIO v. Trump* (*AFGE AFL-CIO*), 929 F.3d 748, 752 (D.C. Cir. 2019). The statute is set forth in Chapter 71 of the U.S. Code, titled Labor-Management Relations, and Title VII in the Civil Service Reform Act (CSRA).

Congress determined in the FSLMRS that "experience in both private and public employment indicates that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them safeguards the public interest, contributes to the effective conduct of public business, and facilitates and encourages the amicable settlements of disputes between employees and their

---

[1] The specific scope of the injunction is detailed in the Conclusion section below.

United States District Court
Northern District of California

employers involving conditions of employment." 5 U.S.C. §§ 7101(a)(1)(A)-(C). The statute was enacted to "prescribe certain rights and obligations of the employees of the Federal Government and establish procedures which are designed to meet the special requirements and needs of the Government." *Id.* § 7101(b). Congress expressly declared that "labor organizations and collective bargaining in the civil service are in the public interest." *Id.* § 7101(a).

The FSLMRS grants and protects the rights of federal employees "to form, join, or assist any labor organization, or to refrain from any such activity." *Id.* § 7102. The statute contemplates a role for, and the active participation of, unions and labor organizations in the collective bargaining process by stating that "[a] labor organization which has been accorded exclusive recognition . . . is entitled to act for, and negotiate collective bargaining agreements covering, all employees in a unit" and "is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership." *Id.* § 7114(a)(1).

The FSLMRS "requires that unions and federal agencies negotiate in good faith over certain matters." *AFGE AFL-CIO*, 929 F.3d at 752. The statute "removes from the duty to bargain management functions which Congress deemed essential to effective conduct of agency business," but agencies must still bargain over, *inter alia*, the procedures by which these management rights are exercised. *Overseas Educ. Ass'n, Inc. v. FLRA*, 876 F.2d 960, 962 (D.C. Cir. 1989); *see* 5 U.S.C. § 7106. It also sets standards for the grievance procedures to be negotiated between labor and management, proscribes certain types of conduct as "unfair labor practices," and establishes parameters for union activities. *See* 5 U.S.C. §§ 7116, 7118, 7120, 7121. The FSLMRS prohibits certain forms of concerted activities, such as labor strikes, but requires that, in general, unions and federal agencies negotiate over the terms and conditions of employment unless a bargaining proposal is contrary to existing federal law, rule, or regulation. *See id.* §§ 7103, 7114, 7116, 7117.

Congress did not "include the entire federal workforce within this regime." *Am. Fed'n of Gov. Emp., AFL-CIO v. Reagan*, 870 F.2d 723, 724 (D.C. Cir. 1989). Agencies engaged in national security work such as the "the Federal Bureau of Investigation, the Central Intelligence

4

United States District Court
Northern District of California

Agency, the National Security Agency," and "the United States Secret Service and the United States Secret Service Uniformed Division," were excluded from coverage under the FSLMRS. 5 U.S.C. §§ 7103(a)(3)(B)-(D), (H). In addition, Congress provided that the "President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." *Id.* § 7103(b)(1).

In 1979, President Carter was the first president to invoke the national security exclusion power in Section 7103(b)(1). *See* Exec. Order No. 12171, *Exclusions from the Federal Labor-Management Relations Program*, 44 Fed. Reg. 66565 (Nov. 20, 1979). EO 12171 did not exclude any cabinet departments or agencies in their entirety from Chapter 71 coverage, but did exclude approximately 50 subdivisions from agencies such as the General Services Administration, the Library of Congress, and the Departments of Treasury, Defense, Justice, and Energy. *Id.* at 66565-66. Examples of specific subdivisions that were excluded by EO 12171 are the "U.S. Army Intelligence and Security Command," "Fleet Intelligence Center, Europe and Atlantic" of the Department of Navy, the "Offices of the Assistant Secretary for Defense Programs" of the Department of Energy, and the "Defense Intelligence Agency" of the Department of Defense. *Id.* Section 7103(b)(1) has been invoked by every president after President Carter, other than President Biden, to exclude subdivisions of agencies from Chapter 71 coverage.[2]

Overall, the FSLMRS is a comprehensive statute intended to govern the relations between the federal government and its civil servants, with a careful eye toward national security concerns. It balances the rights of employees to "participate . . . in decisions which affect them" with "national security" and the "efficient accomplishment of the operations of the Government," in service of the "public interest." 5 U.S.C. §§ 7101(a)(1)-(2), 7103(b)(1). As the Supreme Court of

---

[2] *See* 5 U.S.C. § 7103, U.S. Gov't Publishing Office, available at https://www.govinfo.gov /content/pkg/USCODE-2019-title5/html/USCODE-2019-title5-partIII-subpartF-chap71-subchapI-sec7103.htm (collecting list of excluded agencies and subdivisions, organized by Executive Order).

5

the United States concluded with respect to the statute, "Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had been under the Executive Order regime." *ATF v. FLRA*, 464 U.S. 89, 107 (1983); *see also INS v. FLRA*, 855 F.2d 1454, 1463 (9th Cir. 1988).

## II.   EXECUTIVE ORDER 14251 AND THE WHITE HOUSE FACT SHEET

On March 27, 2025, President Trump signed Executive Order 14251, which invoked Section 7103(b)(1) and amended Executive Order 12171 by adding a number of agencies and subdivisions to the list of those excluded from Chapter 71 coverage.  Exec. Order No. 14251, *Exclusions from Federal Labor-Management Relations Programs*, 90 Fed. Reg. 14553 (Apr. 3, 2025) (EO 14251).

EO 14251 stated that the "agencies and agency subdivisions set forth in section 2 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work" and that "Chapter 71 . . . cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." *Id.* at 14553.  The full list of agencies and agency subdivisions designated for exclusion under section 2 includes:

a. The Department of State.

b. The Department of Defense, except for any subdivisions excluded pursuant to section 4 of the Executive Order of March 27, 2025, entitled 'Exclusions from Federal Labor-Management Relations Programs.'

c. The Department of the Treasury, except the Bureau of Engraving and Printing.

d. The Department of Veterans Affairs.

e. The Department of Justice.

f. Agencies or subdivisions of the Department of Health and Human Services:

   i. Office of the Secretary.

   ii. Food and Drug Administration.

   iii. Centers for Disease Control and Prevention.

iv. Administration for Strategic Preparedness and Response.

v. Office of the General Counsel.

vi. Office of Refugee Resettlement, Administration for Children and Families.

vii. National Institute of Allergy and Infectious Diseases, National Institutes of Health

g. Agencies or subdivisions of the Department of Homeland Security:

i. Office of the Secretary.

ii. Office of the General Counsel.

iii. Office of Strategy, Policy, and Plans.

iv. Management Directorate.

v. Science and Technology Directorate.

vi. Office of Health Security.

vii. Office of Homeland Security Situational Awareness.

viii. U.S. Citizenship and Immigration Services.

ix. United States Immigration and Customs Enforcement.

x. United States Coast Guard.

xi. Cybersecurity and Infrastructure Security Agency.

xii. Federal Emergency Management Agency.

h. Agencies or subdivisions of the Department of the Interior:

i. Office of the Secretary.

ii. Bureau of Land Management.

iii. Bureau of Safety and Environmental Enforcement.

iv. Bureau of Ocean Energy Management.

i. The Department of Energy, except for the Federal Energy Regulatory Commission.

j. The following agencies or subdivisions of the Department of Agriculture:

i. Food Safety and Inspection Service.

ii. Animal and Plant Health Inspection Service.

k. The International Trade Administration, Department of Commerce.

l. The Environmental Protection Agency.

m. The United States Agency for International Development.

n. The Nuclear Regulatory Commission.

o. The National Science Foundation.

p. The United States International Trade Commission

q. The Federal Communications Commission.

r. The General Services Administration.

s. The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management:

i. Office of the Chief Information Officer.

ii. any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty.

90 Fed. Reg. 14553-54.

In section 4, EO 14251 delegated authority to the Secretaries of Defense and Veterans Affairs to suspend the exclusionary effect of certain portions of Order 12171 if the "Secretary certifies to the President that the provisions of the [FSLMRS] can be applied to such subdivision in a manner consistent with national security requirements and considerations . . . within 15 days of the date of this order." *Id.* at 14555-56. The Order also delegated authority to the Secretary of Transportation to "issue orders excluding any subdivision of the Department of Transportation, including the Federal Aviation Administration, from [FSLMRS] coverage." *Id.* at 14556. The Order directed the "head of each agency with employees covered by Chapter 71" to "submit a report [within 30 days] . . . that identifies any agency subdivisions not covered by Executive Order 12171 . . . that have as a primary function intelligence, counterintelligence, investigative, or national security work . . . [and] for which the agency head believes the provisions of Chapter 71 . . . cannot be applied to such subdivision in a manner consistent with national security requirements and considerations." *Id.*

8

United States District Court
Northern District of California

EO 14251 excluded an unprecedented number of federal employees from coverage under the FSLMRS. As another district court determined, the Order excludes "two-thirds of the federal workforce" from the collective bargaining guarantees of Chapter 71. *Nat'l Treasury Emp. Union v. Trump* (*NTEU I*), --- F. Supp. 3d ---, 2025 WL 1218044, at *9 (D.D.C. Apr. 28, 2025). In response to a question by the Court during oral argument here, the government conceded the next closest Executive Order in scope was EO 12171 signed by President Carter, which the government acknowledged did not come close to the scope of EO 14251. Dkt. No. 58 at 5:23-6:2, 6:10-7:7.

It bears mention that EO 12171 excluded agency subdivisions plainly related to national security, most of which were in the Departments of the Army, Navy, and Air Force, with a number of subdivisions specified at a high level of granularity, such as the "Project Office at El Segundo, California" and the "3480 Technical Training Wing . . . Goodfellow Air Force Base, Texas." 44 Fed. Reg. at 66566. In contrast, EO 14251 excludes whole cabinet-level departments, such as the Department of State, the Department of Justice, the Department of Veteran Affairs, and the Department of Energy, other than the Federal Energy Regulatory Committee. 90 Fed. Reg. at 4553-54. It is undisputed that President Trump is the first president since the enactment of the FSLMRS to order the exclusion of cabinet-level departments in their entirety from Chapter 71. These departments house many agencies and subdivisions within them. For example, the Departments of Justice, Energy, and State each contain no less than 25 agencies and subdivisions.[3] The primary exemption from exclusion granted by EO 14251 was to "the immediate, local employing offices of any agency police officers, security guards, or firefighters, provided that this [exemption] does not apply to the Bureau of Prisons." *Id.* at 4554. Consequently, although the bullet list of subdivisions excluded by EO 12171 might look lengthy, EO 14251 affects a vastly greater portion of the federal government, and excludes exponentially more federal workers from Chapter 71 coverage than what the government says is the Order's closest predecessor.

---

[3] *See* U.S. Dep't of Just., *Agencies* (last accessed June 23, 2025), https://www.justice.gov /agencies/chart/grid; U.S. Dep't of Energ., *Our Leadership & Offices* (last accessed June 23, 2025), https://www.energy.gov/our-leadership-offices; U.S. Dep't of State, *Bureaus and Offices* (last accessed June 23, 2025), https://www.state.gov/bureaus-and-offices-list. *See also* Fed. R. Evid. 201(b)(2).

9

On the same day that EO 14251 was issued, the White House published a "Fact Sheet" explaining the action. *See Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), Dkt. No. 15-22 at Ex. 3 (Fact Sheet). The Fact Sheet stated that the Order was issued "to end collective bargaining with Federal unions" in agencies with "national security missions," which were said to include "Energy Security," "Pandemic Preparedness, Prevention, and Response," "Economic Defense," and "Public Safety," with the caveat noted above that "[p]olice and firefighters will continue to collectively bargain." *Id.* at 1-2.

The Fact Sheet was unsparing in its criticism of federal employee unions. Among other remarks, it stated that the "CSRA enables hostile Federal unions to obstruct agency management," "[t]he outgoing Biden Administration renegotiated many agencies' [collective bargaining agreements or] CBAs to last through President Trump's second term" and that "[a]gencies cannot modify policies in [CBAs] until they expire." *Id.* at 2-3. In a section entitled "Safeguarding American Interests," the Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda" and that the "largest Federal union describes itself as 'fighting back' against Trump." *Id.* at 3. The Fact Sheet concludes by saying that "President Trump supports constructive partnerships with unions who work with him" but "will not tolerate" unions opposed to his agenda. *Id.*

## III.    OFFICE OF PERSONNEL MANAGAMENT

In tandem with EO 14251, the Office of Personnel Management (OPM) issued "Guidance" on the Order on March 27, 2025. Dkt. No. 15-22, Ex. 2. The Guidance stated that the cabinet departments, agencies, and subdivisions listed in EO 14251 "are no longer required to collectively bargain with Federal unions" and that the unions would no longer be treated as "exclusive[ly] recogni[zed] labor organizations for employees." *Id.* at 3 (brackets in original). OPM advised the departments, agencies, and subdivisions to "cease participating in grievance procedures after terminating their CBAs," "discontinue participation" in pending arbitrations to resolve employment disputes, and "not participate in further grievance arbitration proceedings following termination of" the CBAs. *Id.* at 5. OPM advised that provisions in CBAs governing "reductions

United States District Court
Northern District of California

Case 3:25-cv-00457-MJP   Document 64   Filed 06/24/25   Page 14 of 32

1  in force" actions, which are large-scale terminations of employment, "will no longer apply." *Id.*

2  The departments, agencies, and subdivisions were instructed to refuse union representatives the

3  right under the CBAs to engage in representational work during business hours in office facilities.

4  *Id.* at 6.  OPM also advised that agencies "should terminate" the deduction of union dues from

5  paychecks.  *Id.*

6        OPM published and distributed to the affected agencies a "Frequently Asked Questions"

7  document (OPM FAQs) on April 8, 2025, which was updated on April 22, 2025.  *See* Dkt. No. 47-

8  4 ¶ 11 & Ex. A.  The first question-and-answer set advised that "[a]gencies should not terminate

9  any CBAs until the conclusion of litigation or further guidance from OPM directing such

10  termination."  *Id.*, Ex. A at 1.  The government did not argue that this statement should be a reason

11  to deny plaintiffs' request for a preliminary injunction, or that it otherwise is of any relevance

12  here, including with respect to plaintiffs' showing of irreparable harm.  OPM does not have direct

13  authority to control other agency's personnel actions.  *See Am. Fed. of Gov't Emp. v. Trump*

14  (*AFGE*), --- F.4th ---, 2025 WL 1541714, at *8 (9th Cir. May 30, 2025) ("OPM ha[s] only

15  supervisory authority" and cannot direct federal agencies to hire or fire personnel (citing 5 U.S.C.

16  §§ 1101-05)); *see also Am. Fed'n of Gov't Emp., AFL-CIO v. OPM*, 821 F.2d 761, 768-70 (D.C.

17  Cir. 1987); *Federal/Postal/Retiree Coalition v. Devine*, 751 F.2d 1424, 1430-31 (D.C. Cir. 1985).

18  During oral argument, the government forthrightly agreed that OPM has limited authority over

19  agencies.  *See* Dkt. No. 58 at 20:5-8 ("OPM provides guidance to agencies of what to do; but it is

20  ultimately the secretary of the agency who controls the employment practices at that agency.").  In

21  addition, plaintiffs presented evidence that at least two agencies have terminated CBAs for their

22  employees notwithstanding the OPM guidance.  *See* Dkt. No. 15-17 ¶ 8 (termination of CBA for

23  Department of State Passport Services agency); Dkt. No. 15-35 ¶ 11 (termination of CBA for

24  Department of Agriculture Animal and Plant Health Inspection Service agency).

25  **IV.   THIS LITIGATION**

26        Plaintiffs filed this case on April 3, 2025, one week after EO 14251 was signed.  Dkt.

27  No. 1.  The plaintiffs are six unions:  the American Federation of Government Employees,  AFL-

28  CIO (AFGE); American Federation of State, County & Municipal Employees, AFL-CIO

United States District Court
Northern District of California

United States District Court
Northern District of California

1  (AFSCME); National Nurses Organizing Committee/National Nurses United (NNOC/NNU);

2  Service Employees International Union, AFL-CIO (SEIU); National Association of Government

3  Employees, Inc. (NAGE); and National Federation of Federal Employees, IAM, AFL-CIO

4  (NFFE).  *Id*. ¶¶ 17-30.  Plaintiffs allege, without dispute by the government, that AFGE is "the

5  largest union of federal workers" and "represents approximately 800,000 federal civilian

6  employees through its affiliated councils and locals in every state in the United States and the

7  District of Columbia."  *Id*. ¶ 17.  AFSCME, through its constituent entities, represents "federal

8  civilian employees in agencies and departments across the federal government."  *Id*. ¶ 20.

9  NNOC/NNU includes among its members "Registered Nurses working in the Department of

10  Veterans Affairs across 13 states"; SEIU, together with its local affiliates, "represents

11  approximately 80,000 federal sector employees"; NAGE "represents approximately 75,000 federal

12  civilian bargaining unit employees"; and NFFE "is a national labor union representing

13  approximately 110,000 professional and non-professional federal government workers across the

14  United States."  *Id*. ¶¶ 22, 24, 25, 28.  All six unions represent employees at some of the agencies

15  and subdivisions that were excluded from the FSLMRS by the Order, and they "bring this action

16  on behalf of themselves as organizations and on behalf of their members, who have lost statutory

17  and contractual protections at work due to the Exclusion Order."  *Id*. ¶¶ 30, 150-83.

18       The named defendants are Donald J. Trump, sued in his official capacity as the President

19  of the United States, and dozens of departments and agencies, as well as the heads of those federal

20  government bodies.  *Id*. ¶¶ 31-72.  The departments include the United States Department of State,

21  Department of Defense, Department of the Treasury, Department of Veterans Affairs, and the

22  Department of Justice.  The agencies include the Office of Personnel Management, United States

23  Agency for International Development (USAID), and the National Science Foundation.  The

24  individual defendants include Charles Ezell, Marco Rubio, Peter Hegseth, Scott Bessent, Doug

25  Collins, Pamela Bondi, and Robert F. Kennedy Jr., all sued in their official capacities.  All

26  defendants are jointly represented in this case by the same Department of Justice attorneys, and

27  unless specified otherwise, the Court will refer to all defendants together as the "government."

28

1

Plaintiffs' complaint alleges claims against the government for (1) retaliation and

2 viewpoint discrimination in violation of the First Amendment to the U.S. Constitution; (2) ultra

3 vires action by the President in violation of Chapter 71 of Title 5 of the U.S. Code;

4 (3) deprivations of procedural due process in violation of the Fifth Amendment; (4) abrogation of

5 property rights in a federal contract in violation of the Fifth Amendment; and (5) arbitrary and

6 irrational classification in violation of the Equal Protection component of the Fifth Amendment.

7 *Id*. ¶¶ 211-51.  The complaint seeks declaratory and injunctive relief, and attorney's fees and costs.

8 *Id*. at 41.

9

Promptly after filing the complaint, plaintiffs filed a motion for a temporary restraining

10 order asking to enjoin defendants from implementing or giving effect to EO 14251.  Dkt. No. 15.

11 The Court denied a TRO, finding that plaintiffs had not sufficiently established "the immediacy

12 required for a TRO to be issued at this nascent stage, before the other side has even been served

13 with the summons."  Dkt. No. 28 at 1.  Federal Rule of Civil Procedure 65(b)(1)(A) permits a

14 temporary restraining order to be issued on an ex parte basis only if "specific facts . . . clearly

15 show that immediate and irreparable injury, loss, or damage will result to the movant before the

16 adverse party can be heard in opposition."  Fed. R. Civ. P. 65(b)(1)(A).  The Court determined that

17 plaintiffs' motion for a TRO should instead be treated as a motion for a preliminary injunction,

18 and set a schedule for the government to oppose the motion and for plaintiffs to reply to the

19 opposition.  Dkt. No. 28.

20

Defendants subsequently appeared in the case and filed an opposition to the preliminary

21 injunction request, to which plaintiffs have filed a reply.  Dkt. Nos. 44, 47.  The Court also

22 received, and now accepts for filing on the docket, a brief in support of the preliminary injunction

23 motion filed by amici curiae, who are former senior national security officials and advisors, and

24 other interested parties.  Dkt. No. 36-1.[4]  In addition to the briefs, the Court took oral argument

25

26

27 ────────────────────

[4] The amici are John Beed, Charles Blanchard, Mary DeRosa, Gordon Gray, J. Michael Luttig, Mara Rudman, Suzanne Spaulding, and the Bar Association of the District of Columbia.  Their backgrounds are described in Dkt. No. 36.  Their proposed brief, Dkt. No. 36-1, is deemed filed.

28

<div style="writing-mode: vertical-rl">United States District Court<br/>Northern District of California</div>

1    from plaintiffs and the government at a preliminary injunction hearing held on June 18, 2025.

2    Dkt. No. 55.

3                                    **DISCUSSION**

4    **I.        LEGAL STANDARDS**

5           Preliminary injunctions are "an extraordinary remedy never awarded as of right." *Winter*

6    *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary

7    injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

8    irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

9    and that an injunction is in the public interest." *Id*. at 20. The irreparable harm must be "*likely* in

10   the absence of an injunction" and not merely possible, no matter how strong the likelihood that

11   plaintiffs will prevail on the merits. *Id*. at 21-22 (emphasis in original).

12          In our circuit, it is well established that a preliminary injunction may also be issued where

13   "the likelihood of success is such that 'serious questions going to the merits were raised and the

14   balance of hardships tips sharply in [plaintiff's] favor.'" *Alliance for the Wild Rockies v. Cottrell*,

15   632 F.3d 1127, 1131 (9th Cir. 2011) (citation omitted). Our circuit held after careful consideration

16   that "the 'serious questions' approach survives *Winter* when applied as part of the four-element

17   *Winter* test." *Id*. at 1131-32; *see also id*. at 1134 (affirming "the longstanding discretion of a

18   district judge to preserve the *status quo* with provisional relief until the merits could be sorted out

19   in cases where clear irreparable injury would otherwise result and at least 'serious questions'

20   going to the merits are raised'") (quoting *Save Strawberry Canyon v. Dep't of Energy*, No. C 08-

21   03494 WHA, 2009 WL 1098888, at *1-3 (N.D. Cal. Apr. 22, 2009)). Our circuit has continued to

22   apply this test. *See*, *e.g.*, *hiQ Labs, Inc. v. LinkedIn Corporation*, 31 F.4th 1180, 1191 (9th Cir.

23   2022) (finding that "hiQ has raised 'serious questions going to the merits'" and affirming the

24   district court's grant of a preliminary injunction); *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th

25   1173, 1177 (9th Cir. 2021) ("[T]he sliding scale test 'remains viable after the Supreme Court's

26   decision in *Winter*.'") (quoting *Alliance for the Wild Rockies*, 632 F.3d at 1131-35).

27

28

United States District Court
Northern District of California

## II.    JURISDICTION

The government raises a challenge to jurisdiction.  To be clear, it does not say that plaintiffs lack Article III standing, and for good reason.  Plaintiffs have adequately established standing to sue in federal court.  *See* Dkt. No. 15-1 at 16-17.  Rather, the government says that Congress has "channeled away" jurisdiction over plaintiffs' claims to an alternative forum and so divested the Court of the power to hear this case.  Dkt. No. 44 at 9.

"Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider."  *Bowles v. Russell*, 551 U.S. 205, 212 (2007).  Federal district courts ordinarily have jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, but Congress may implicitly preclude district courts from exercising jurisdiction over certain claims by establishing an alternative scheme for administrative or judicial review.  *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-16 (1994); *AFGE*, 2025 WL 1541714, at *3.  The government says that is the situation here because Congress established, through the FSLMRS, a system of administrative review by way of the Federal Labor Relations Authority (FLRA).  Dkt. No. 48 at 9-12.

The point is not well taken.  The FSLMRS states that the FLRA "shall be responsible for carrying out the purpose *of this chapter*."  5 U.S.C. § 7105(a)(1) (emphasis added).  The statute's plain language makes clear the FLRA's authority extends only to those disputes which arise under Chapter 71.  *See, e.g.*, *id.* § 7105(a)(2)(E) (authority to "resolve[] issues relating to the duty to bargain in good faith under section 7117(c) of this title"), § 7105(a)(2)(G) (authority to "conduct hearings and resolve complaints of unfair labor practices under section 7118 of this title").  Pursuant to Section 7103(b), EO 14251 expressly removed the employees of the listed departments, agencies, and subdivisions from Chapter 71's coverage.  As a result, those employees, and their unions as representatives, are no longer covered by the statute, and they cannot bring claims over which Congress granted the FLRA authority.  The FLRA itself is of the view that it does not have authority to hear claims brought in connection with agencies excluded from Chapter 71 coverage.  *See, e.g.*, *U.S. Att'ys Off. S. Dist. of Texas Houston, Texas & Am. Fed'n of Gov't Emps. Loc. 3966*, 57 F.L.R.A. 750 (2002); *Dep't of the Navy, Naval Telecomms.*

15

1    *Ctr., Ward Circle Activity v. Navtelcom Unit Loc. No. 1, Am. Fed'n of Gov't Emp., AFL-CIO*, 6

2    F.L.R.A. 498, 500 (1981).

3         Consequently, the FSLMRS's "language, structure, and purpose" make clear Congress did

4    not "allocate[] initial review to an administrative body," *Thunder Basin*, 510 U.S. at 207, because

5    the plaintiff unions bring claims in connection with employees who are "exclud[ed] . . . from

6    coverage under" Chapter 71, 5 U.S.C. § 7103(b)(1).  Another district court has reached the same

7    conclusion in a similar case.  *See NTEU I*, 2025 WL 1218044, at *5 ("The administrative review

8    scheme . . . is not available to challenge" EO 14251 "for the simple reason that those agencies and

9    subdivisions have been excluded from the FSLMRS's coverage.").

10        Even so, the government says plaintiffs' claims should still go to the FLRA because

11   plaintiffs allege that "Executive Order 14,251 is invalid, meaning the agencies and subdivisions

12   identified in the Executive Order remain subject to the FSLMRS."  Dkt. No. 44 at 9.  In effect, the

13   government suggests that plaintiffs should not be allowed in federal court because they have

14   challenged the enforceability of EO 14251.

15        This is an odd suggestion, particularly in light of the government's insistence that EO

16   14251 has already excluded a large swath of agencies and subdivisions from Chapter 71.  The

17   question of the Court's jurisdiction is not answered by the plaintiffs' or defendants' beliefs about

18   the merits of the case.  It is answered by the plain language of the FSLMRS.  The government has

19   not demonstrated that Congress created an alternative administrative review scheme for claims

20   brought by employees and unions who are expressly not covered by Chapter 71.  *See  NTEU I*,

21   2025 WL 1218044, at *6 ("The government's argument misses the point: the administrative

22   process of the FSLMRS cannot and does not govern here.").

23        It bears mention that the government has taken an inconsistent position with respect to

24   jurisdiction in other cases.  It sued over a dozen unions in the Western District of Texas for a

25   declaration that "Plaintiff agencies do have the power and authority under the Executive Order to

26   rescind or repudiate the subject CBAs" because "[t]he Executive Order was lawful under 5 U.S.C.

27   § 7103(b)."  Dkt. No. 1 ¶ 174, in *U.S. Dep't of Defense v. Am. Fed'n of Gov't Emp.*, Case No.

28   6:25-cv-00119-ADA.  The government alleged "jurisdiction under 28 U.S.C. § 1331," *id.* ¶ 12,

United States District Court
Northern District of California

16

1  and certainly did not suggest its case should have been filed with the FLRA.  The government

2  tried to sidestep this contradiction by saying the claims there "are different," Dkt. No. 44 at 12, but

3  did not say why that might be so, or what the ostensible difference is.  There and here, the

4  question is whether EO 14251 may be enforced.[5]

5  **III.    THE INJUNCTION FACTORS**

6      **A.    Success on the Merits**

7          **1.    First Amendment**

8        To support their preliminary injunction request, plaintiffs rely primarily on their claim that

9  "the Exclusion Order retaliates against plaintiffs for constitutionally protected speech and

10  petitioning."  Dkt. No. 15-1 at 18-24.  This is plaintiffs' strongest claim, and they have

11  demonstrated a serious question as to whether their First Amendment rights have been violated.

12        "To bring a First Amendment retaliation claim, the plaintiff must allege that (1) it engaged

13  in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary

14  firmness' from continuing to engage in the protected activity; and (3) the protected activity was a

15  substantial motivating factor in the defendant's conduct -- i.e., that there was a nexus between the

16  defendant's actions and an intent to chill speech."  *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,

17  824 F.3d 858, 867 (9th Cir. 2016).

18        Plaintiffs are highly likely to be able to establish that they engaged in constitutionally

19  protected activity.  The record establishes that plaintiffs have frequently spoken against actions

20  undertaken by President Trump and his administration since January 2025.  For example, plaintiff

21  AFGE has filed multiple lawsuits against President Trump's executive orders and actions taken by

22  the Department of Government Efficiency (DOGE).  *See* Dkt. No. 15-19 (Huddleston Decl.) ¶¶ 6-

23  50.  AFGE also made public criticisms of the administration, including by publishing a webpage

24  entitled, "What AFGE Is Doing: A Recap of AFGE's Major Actions Against Trump's Attacks on

25  _____

26  [5] The government's position can fairly be characterized as a "heads, I win; tails, you lose"
   proposition.  If EO 14251 is valid, then plaintiffs lose because they are excluded from the scope of
27  FSLMRS coverage.  If it is invalid, then plaintiffs again lose because the Court lacks jurisdiction
   over their claims.  The government exacerbates this unfairness by claiming that only it has
28  jurisdictional standing to affirmatively seek a district court's declaration of the validity of EO
   14251.

United States District Court
Northern District of California

Civil Service." Dkt. No. 15-19, Ex. 1. Plaintiff SEIU, too, has filed and participated in many lawsuits challenging the administration's actions, and posted statements on its publicly-available website "criticiz[ing] actions taken by the Trump Administration." Dkt. No. 15-46 (Ury Decl.) ¶¶ 15-24. Plaintiff AFSCME has made public statements criticizing the administration's actions. *See* Dkt. No. 15-36 (Ricci Decl.) ¶¶ 41-48. All these activities constitute speech that ranks "high in the hierarchy of First Amendment values." *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (discussing plaintiff's "lawsuit against the City and his criticisms of public officials"). The unions' statements are quintessential utterances of "political expression" that are cloaked in the "broadest protection" accorded under the First Amendment. *Ariz. Students' Ass'n*, 824 F.3d at 867 (internal quotation marks omitted) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam)).

Plaintiffs have also demonstrated a likelihood of proving that "defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity." *Id.* at 867. The "test for determining whether the alleged retaliatory conduct chills free speech is objective," *id.* at 868, and the focus is on "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (internal quotations marks and citation omitted).

Plaintiffs have presented evidence of the chilling effect of EO 14251 on their speech rights. In the words of a physical therapist who works at a VA Medical Center and is an Executive Vice President for the National Veterans Affairs Council of the AFGE, "[f]rom my interactions with other VA employees, I believe many workers will feel pressure to conform to the administration's political views and be reluctant to raise health and safety concerns or otherwise criticize agency management, for fear of further retaliation." Dkt. No. 15-9 (Burke Decl.) ¶¶ 2-3, 12.

The president of AFSCME Local 3719 expressed the same concern:

> AFSCME Local 3719 bargaining unit members are very scared of
> losing their collective bargaining rights under the FSLMRS. Our
> collective bargaining rights and union representation have been
> crucial to protect our livelihoods and the mission of the DOJ to
> uphold the rule of law. When we are able to do our jobs knowing

United States District Court
Northern District of California

18

that the Union is there to ensure we are treated fairly, we can work without fear to make sure that DOJ makes our country fairer for everyone.  Without these protections -- and especially now that we have been targeted by the current Administration with the elimination of our collective bargaining rights at a time when AFSCME has been so active in its political advocacy -- my fellow Union members and I will have our speech chilled out of fear of retaliation, making it harder for us to speak up at work to ensure the DOJ is operating as best it can for all Americans.

As a result of the March 27 Executive Order that targets federal unions and workers because of our activity to oppose the Trump administration's illegal actions, I am hesitant and fear more repercussions by speaking up and advocating for workers in my role as the president of AFSCME Local 3719.

Dkt. No. 15-10 (Cameron Decl.) ¶¶ 15-16; *see also* Dkt. No. 47-4 (Kelley Supplemental Decl.) ¶ 16 ("Many leaders and rank-and-file members of AFGE have contacted me to express fear that if the union continues to speak out against the Executive Order and OPM Memorandum -- or any of the administration's policies -- that more AFGE members could lose their unions in retaliation.  I am also aware that many local affiliates that were not directly affected by the Executive Order and OPM Memorandum have become more cautious about raising workplace issues in the wake of the order, let alone speaking out in public about the administration's policies.").  This is persuasive evidence of the chilling effect of the government's challenged conduct.

Plaintiffs have also established that there is a serious question whether "the protected activity was a substantial motivating factor in the defendant's conduct -- i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students' Ass'n*, 824 F.3d at 867.  "A plaintiff may establish motive using direct or circumstantial evidence." *Id*. at 870; *see also Mendocino Env't Ctr.*, 192 F.3d at 1300-01 ("[i]ntent to inhibit speech" is an element of the claim and "can be demonstrated either through direct or circumstantial evidence").  "Direct evidence of improper motive . . . will only rarely be available," *id*., and it is sufficient for the plaintiffs to demonstrate "circumstances connecting the defendant's retaliatory intent to the suppressive conduct," *Ariz. Students' Ass'n*, 824 F.3d at 870.

Plaintiffs highlight the White House Fact Sheet, which the government forthrightly embraced during the hearing as "relevant" to the interpretation of EO 14251.  Dkt. No. 58 at 12:15-17; *see also id*. at 9:15-10:7 (government's lawyer pointing, in response to the Court's

United States District Court
Northern District of California

1  question about viewpoint discrimination, to "the President's claim in th[e] fact sheet").  As

2  discussed above, the Fact Sheet expressed a clear point of view that is hostile to federal labor

3  unions and their First Amendment activities.  *See* Dkt. No. 15-22, Ex. 3.  The Fact Sheet called out

4  federal unions for vocal opposition to President Trump's agenda.  It condemned unions who

5  criticized the President and expressed support only for unions who toed the line.  It mandated the

6  dissolution of long-standing collective bargaining rights and other workplace protections for

7  federal unions deemed oppositional to the President.  *See id*.  All of this is solid evidence of a tie

8  between the exercise of First Amendment rights and a government sanction.

9       The invocation of the national security exception in Section 7103(b)(1) does not

10  necessarily rebut this nexus, as the government would have it.  The Court has no intention in this

11  order of second-guessing the President's national security determinations, or calling on the

12  government to prove the determinations were properly made.  As noted, the Executive Branch is

13  owed deference in such matters.  *See Humanitarian Law Project*, 561 U.S. at 33-34.  But a claim

14  of national security does not, of course, automatically negate the Constitution, particularly with

15  respect to the First Amendment.  *Id*. at 34; *see also United States v. Robel*, 389 U.S. 258, 264

16  (1967) ("Implicit in the term 'national defense' is the notion of defending those values and ideals

17  which set this Nation apart," and "the most cherished of those ideals have found expression in the

18  First Amendment.").  Even with the deference due to the executive and legislative branches in

19  matters of national security and defense, the judiciary may decide the question of constitutional

20  limitations.

21       Plaintiffs have adduced evidence that a serious question may be asked whether the agency

22  exclusions in EO 14251 are retaliation for protected speech.  As discussed, President Trump

23  applied the national security label to an unprecedented swath of federal agencies, including whole

24  cabinet departments for the first time in history.  The scope of this classification greatly exceeded

25  any prior executive order, including President Carter's order, which the government said "was

26  probably the closest" as a precedent.  Dkt. No. 58 at 6:10-7:7.  The government itself had a hard

27  time saying why an agency like the National Institute of Allergy and Infectious Diseases might be

28  properly regarded as having a primary mission of national security.  *See id*. at 13:3-16.  It also

bears mention that the FLRA, the tribunal on which the government places much stock, defined "national security" as used in the FSLMRS "to include only those sensitive activities of the government that are directly related to the protection and preservation of the military, economic, and productive strength of the United States . . . against or from espionage, sabotage, subversion, foreign aggression, and any other illegal acts which adversely affect the national defense." *Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Employees Local R5-181*, 4 F.L.R.A. 644, 655-56 (1980). Many of the departments and agencies listed in EO 14251 do not readily appear to fit this definition. None of this is to say that the Court will sit in judgment of the President's national security determinations. It will not. Rather, this is evidence in the record of a serious and plausible First Amendment question.

"Otherwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment." *Ariz. Students' Ass'n*, 824 F.3d at 869 (internal quotations and citation omitted); *see also Lozman*, 555 U.S. at 95 (that there was probable cause for plaintiff's arrest did not bar plaintiff's claim that "notwithstanding the presence of probable cause, his arrest at the city council meeting violated the First Amendment because the arrest was ordered in retaliation for his earlier, protected speech"). The fact that plaintiffs do not have a First Amendment right to collective bargaining, *see* Dkt. No. 44 at 23, is beside the point. Plaintiffs are not claiming any such right under the First Amendment, and the anti-retaliatory "limitations [under the First Amendment] apply even if the aggrieved party has no independent or affirmative right to that government benefit" in any event. *Ariz. Students' Ass'n*, 824 F.3d at 869.

While the government points to the presumption of regularity, Dkt. No. 44 at 23, that too does not necessarily save the day. The presumption "supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Reagan*, 870 F.2d at 727 (internal quotations omitted). In other words, "[e]very public official is presumed to act in obedience to his duty, until the contrary is shown." *Id*. (quoting *Martin v. Mott*, 25 U.S. 19, 32-33 (1827)). Here, plaintiffs have shown a sufficient likelihood that they will prevail on the argument that the presumption has no application

because there is an "actual irregularity in the President's factfinding process or activity," and the opposite conclusion is warranted that "the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." *Id*. at 728.

Overall, plaintiffs have demonstrated a serious question under the First Amendment that warrants preserving the status quo pending further litigation. The Court need not take up plaintiffs' other claims as a potential ground for an injunction.

**B.    Irreparable Harm**

For a preliminary injunction to issue, the threat of irreparable harm must be "likely" and not merely "possible." *See Winter*, 555 U.S. at 22. "[W]hile 'likely' is a higher threshold than 'possible,'" plaintiffs "need not prove that irreparable harm is certain or even nearly certain." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011).

Plaintiffs have met their burden. Although "monetary injury is not normally considered irreparable," the "threat of being driven out of business is sufficient to establish irreparable harm." *hiQ Labs*, 31 F.4th at 1188 (cleaned up). "Thus, showing a threat of 'extinction' is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable." *Id*. (citation omitted). Plaintiffs' submissions adequately demonstrate this harm. NFFE has shown, for example, that the amount of allotted dues (*i.e.*, dues paid through payroll deduction) has suffered a reduction of 58.2% since the Exclusion Order. Dkt. No. 47-3 (Erwin Supplemental Decl.) ¶¶ 11-12. While NFFE is making a "concerted effort to offset a portion of losses by transitioning members from dues allotment to direct dues, NFFE's total dues-related revenue for the April 19, 2025 pay period alone, decreased by $126,966," and there is good reason to believe "many members will decline to pay or stop paying dues directly to NFFE because NFFE is no longer recognized as the exclusive representative for them in the workplace." *Id*. ¶¶ 14-16.

For its part, AFGE has suffered a "reduction of more than 82%" in the amount of allotted dues, from $4,195,052 for the two-week pay period ending March 28, 2025, to $752,686 in the pay period ending April 25, 2025. Dkt. No. 47-4 (Kelley Supplemental Decl.) ¶¶ 23-24. In response to this "collapse in the union's revenue," the National Executive Council has approved "a

22

massive reduction-in-force of AFGE's operating staff -- cutting its staff from 355 budgeted positions to just 151, a reduction of nearly 60%," and "AFGE has already begun the process of laying off staff members in accordance with the NEC's directive." *Id*. ¶¶ 29-32. AFGE further states with factual support that "[t]hese layoffs will have immediate effects on AFGE's ability to perform its core functions." *Id*. ¶¶ 33-34. Everett Kelley, the national president of the AFGE, declares based on these specific evidentiary showings that "[t]hese reductions represent permanent and irreversible damage to AFGE" because the lost "institutional knowledge and experience" and the "goodwill of members" are likely to be irrecoverable, and "if things continue on their current course, there is a genuine danger that AFGE will cease to exist in its current form, possibly within months." *Id*. ¶¶ 35-37.

The unions' demonstrated threat of being "driven out of business," *hiQ Labs*, 31 F.4th at 1188, is exacerbated by the fact that they have lost their right to office space and to conduct union work during regular work hours. The OPM's FAQs document instructs that "[a]gencies and subdivisions covered by *Exclusions* must reclaim any agency space, furniture, equipment (e.g., computers, phones), and other resources previously utilized by labor unions for representational activities and repurpose those resources for agency business only." Dkt. No. 47-4, Ex. A at 4. In addition, "[e]mployees of covered agencies and subdivisions who were previously authorized to use taxpayer-funded union time are no longer permitted use of such time and should only be conducting agency-assigned work during their scheduled duty time." *Id*. According to plaintiffs' declarations, which the government does not dispute, agencies across the government are in fact "rescinding official time and union office space." Dkt. No. 47-4 (Kelley Supplemental Decl.) ¶ 13.

Plaintiffs have also shown that they have lost collective bargaining rights. Local 1998 of the NFFE, for example, was informed by the Deputy Labor Management Negotiator for Passport Services within the Department of State on March 31, 2025, that "effective immediately, the Department hereby terminates the Collective Agreement with NFFE Local 1998 and will no longer recognize NFFE as an exclusively recognized labor organization." Dkt. No. 15-17 (Hinton Decl.) ¶ 8. Local 2021 of the NFFE was also informed on April 1, 2025, that "as of the date of

23

United States District Court
Northern District of California

this notice, APHIS no longer recognizes the National Federation of Federal Employees (NFFE),

Local 2021 as the exclusive representative for employees referenced in the Federal Labor

Relations Authority (FLRA) certification dated April 14, 2021," and as a result, "[t]he collective

bargaining agreement (CBA) between APHIS, Animal Care and NFFE, Local 2021, dated August

26, 2024, and any other negotiated agreements between these parties are no longer in effect."  Dkt.

No. 15-35 (Radzai Decl.) ¶ 11.

The loss of collective bargaining rights is deemed to be irreparable because "the value of

the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is

delayed or lost."  *Small*, 661 F.3d at 1192 (cleaned up).  In addition, "unions provide a range of

non-economic benefits to employees that are not realized when an employer refuses to bargain

with the union.  For example, unions can ensure greater job security by negotiating seniority

provisions into collective bargaining agreements and union representatives can represent

employees during grievance and arbitration procedures."  *Id*.  These rights too have already been

harmed in the wake of the Exclusion Order.  The National President of the NFFE has submitted a

supplemental declaration explaining that the OPM's FAQs document instructed "excluded

agencies to ignore the rights and obligations of their unionized employees," and further:

> Agencies are generally complying with OPM's instructions and
> refusing to process grievances filed by NFFE, including holding
> arbitration hearings, refusing to provide advance notice of changes
> or negotiating with NFFE on negotiable changes, rescinding official
> time and union office space, and refusing to withhold and allot
> voluntary dues from employee paychecks to NFFE.  For example,
> Passports Services within the Department of State has refused to
> bargain over work schedule changes.  The GSA has refused to
> provide information or bargain on two negotiable subjects:  return to
> work and the reduction-in-force which is in process.  The
> Department of the Air Force has notified us that all negotiations,
> discussions, or actions related to collective bargaining agreements,
> grievances, or responses to requests for information concerning any
> labor related issues are held in abeyance.  Thus, NFFE is unable to
> perform its representational responsibilities and basic role of a union
> at excluded agencies, to the detriment of the federal employees it
> represents.

Dkt. No. 47-3 (Erwin Supplemental Decl.) ¶ 8; *see also* Dkt. No. 47-4 (Kelley Supplemental

Decl.) ¶¶ 11-13 (same for AFGE).

The weakened support for unions as demonstrated in the declaration cites above is also irreparable harm. "As time passes, the benefits of unionization are lost and the spark to organize is extinguished. The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." *Small*, 661 F.3d at 1192 (cleaned up).

The government's attempts to undercut plaintiffs' irreparable harm showing fall flat. The government again says that there is no First Amendment right to collective bargaining, Dkt. No. 44 at 6, but plaintiffs have not claimed such a right. The government says irreparable harm is too speculative, but the record discussed above demonstrates otherwise. The government tries to cabin the harm by suggesting the unions "would simply no longer be the *exclusive* bargaining representative." *Id.* at 7 (emphasis in original). But only a union that is an exclusive representative may enforce collective bargaining agreements or represent bargaining unit employees in resolving workplace disputes. *See* 5 U.S.C. § 7114(a)(1) (a "labor organization which has been accorded exclusive recognition . . . is entitled to act for, and negotiate collective bargaining agreements covering, all employees in a unit"); Dkt. No. 15-10 (Cameron Decl.) ¶¶ 9, 14. Plaintiffs have shown that they are likely to suffer irreparable harm in the absence of an injunction.

### C.       Balance of Hardships and the Public Interest

The balance of hardships and the public interest are considered together in this case. *See E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020) ("When the government is a party, the third and fourth preliminary injunction factors merge.") (citing *Drakes Bay Oyster Co. v. Jewell*, 743 F.3d 1073, 1092 (9th Cir. 2014)). A preliminary injunction will not be granted unless the public interests in favor of granting an injunction "outweigh other public interests that cut in favor of *not* issuing the injunction." *Alliance for the Wild Rockies*, 632 F.3d at 1138 (emphasis in original).

The question is whether a pause of the implementation of the Order will harm the government more than it benefits the plaintiffs. The record indicates it will not. The government itself has advised agencies to defer implementation of many aspects of the Order while litigation is ongoing. As discussed, the OPM's FAQs said that "[a]gencies should not terminate any CBAs

25

1  until the conclusion of litigation or further guidance from OPM directing such termination," and

2  "agencies should not file any decertification petitions [of bargaining units of covered agencies or

3  subdivisions] until litigation regarding *Exclusions* has been resolved." Dkt. No. 47-4, Ex. A at 1.

4  This may be an advisory guideline for the reasons previously stated, but the fact that the

5  government is willing to agree to a pause during litigation indicates that it is not likely to be

6  harmed by a preliminary injunction which orders the same thing. The government's other

7  contentions are purely conclusory and unsupported by any evidence. *See* Dkt. No. 44 at 29.

8          With respect to the public interest, Congress has declared that "labor organizations and

9  collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). The

10  government has not articulated a good reason to conclude otherwise, or that an injunction would

11  not serve the public interest.

12        **D.**    **Bond**

13          Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court "may issue

14  a preliminary injunction . . . only if the movant gives security in an amount that the court considers

15  proper to pay the costs and damages sustained by any party found to have been wrongfully

16  enjoined or restrained." Fed. R. Civ. P. 65(c). The district court retains discretion "as to the

17  amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)

18  (internal quotation marks and citations omitted).

19          The government asked the Court to require plaintiffs to post security, but did not propose

20  an amount or provide any evidence that might be used to determine the bond. *See* Dkt. No. 44 at

21  29 (requesting that, if the Court were to issue an injunction, plaintiffs should be required to "post a

22  bond commensurate with the scope of any injunction"). In effect, the government left the question

23  of bond entirely to the Court's discretion.

24          The Court concludes that a nominal bond is warranted in the amount of $10,000.00 per

25  plaintiff, amounting to a collective bond amount of $60,000.00. Plaintiffs include national unions

26  which received more than $750,000 in allotted dues in a single pay period, even after the Order

27  was issued and went into partial effect. *See* Dkt. No. 47-4 (Kelley Supplemental Decl.) ¶ 24.

28  Consequently, a bond of $10,000.00 per plaintiff union should not impose an undue hardship.

United States District Court
Northern District of California

United States District Court
Northern District of California

**E.      Scope of Injunction**

For the scope of the injunction, plaintiffs requested that the agency defendants and their heads be enjoined from implementing the Exclusion Order.  Dkt. No. 15-2.  The government did not oppose this scope or suggest any tailoring or limitations with respect to specific departments, agencies, or subdivisions.  The Court declines to draw lines when the government has chosen to be silent.  Even so, the preliminary injunction requested by plaintiffs was specific to the exclusions made under Section 2 of EO 14251.  Plaintiffs did not address the foreign service exclusions that were made under Section 3.  Consequently, the Court enjoins the implementation of Section 2 of EO 14251 only.

**CONCLUSION**

A preliminary injunction is granted as follows:

(1)  The Agency Defendants and Agency Head Defendants and their officers, agents, employees, attorneys, and any person acting in concert with them, or at their behest, and who has knowledge of this injunction, are preliminarily enjoined from implementing or enforcing against plaintiffs and their members Section 2 of Executive Order 14251, *Exclusions from Federal Labor-Management Relations Programs*, 90 Fed. Reg. 14553 (Apr. 3, 2025).  The injunction will remain in place pending further order of the Court.

(2) The Agency Defendants are: U.S. Office of Personnel Management; U.S. Department of State; U.S. Agency for International Development; U.S. Department of Defense; U.S. Department of the Treasury; U.S. Department of Veterans Affairs; U.S. Department of Justice; U.S. Department of Health and Human Services; U.S. Department of Homeland Security; U.S. Department of the Interior; U.S. Department of Energy; U.S. Department of Agriculture; U.S. Environmental Protection Agency; U.S. National Science Foundation; U.S. International Trade Commission; U.S. General Services Administration; U.S. Social Security Administration; U.S. Department of Labor; U.S. Department of Housing and Urban Development; U.S. Department of Transportation; and U.S. Department of Education.

United States District Court
Northern District of California

1    (3) The Agency Head Defendants are: CHARLES EZELL, in his official capacity as

2    Acting Director of the U.S. Office of Personnel Management; MARCO RUBIO, in his official

3    capacities as U.S. Secretary of State and Acting Administrator for the U.S. Agency for

4    International Development; PETER HEGSETH, in his official capacity as U.S. Secretary of

5    Defense; SCOTT BESSENT, in his official capacity as U.S. Secretary of the Treasury; DOUG

6    COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs; PAMELA BONDI, in

7    her official capacity as U.S. Attorney General; ROBERT F. KENNEDY JR., in his official

8    capacity as Secretary of Health and Human Services; KRISTI NOEM, in her official capacity as

9    Secretary of Homeland Security; DOUG BURGUM, in his official capacity as Secretary of the

10   Interior; CHRIS WRIGHT, in his official capacity as Secretary of Energy; BROOKE ROLLINS,

11   in her official capacity as Secretary of Agriculture; LEE ZELDIN, in his official capacity as

12   Administrator of the U.S. Environmental Protection Agency; DR. SETHURAMAN

13   PANCHANATHAN, in his official capacity as Director of the U.S. National Science Foundation;

14   AMY A. KARPEL, in her official capacity as Chair of the U.S. International Trade Commission;

15   STEPHEN EHIKIAN, in his official capacity as Acting Administrator of the General Services

16   Administration; LELAND DUDEK, in his official capacity as Acting Commissioner of the Social

17   Security Administration; LORI CHAVEZ-DEREMER, in her official capacity as Secretary of

18   Labor; SCOTT TURNER, in his official capacity as Secretary of the U.S. Department of Housing

19   and Urban Development; SEAN DUFFY, in his official capacity as Secretary of Transportation;

20   and LINDA MCMAHON, in her official capacity as Secretary of Education.[6]

21   (4)  Plaintiffs are ordered to post a $60,000 bond under Federal Rule of Civil Procedure

22   65(c) by 12:00 p.m. California time on July 1, 2025.  The bond will be filed in the Clerk's Office

23   and will be deposited into the registry of the Court.  If the bond is not filed by that time, this order

24   will be dissolved.

---

[6] These are the agency head defendants who were named in plaintiffs' complaint.  Dkt. No. 1.  The parties have not reported any changes to these public office holders but to the extent any changes have occurred, any departed officers' successors are automatically substituted as parties and the successor officers are enjoined under the terms stated in this order.  *See* Fed. R. Civ. P. 25(d).

28

1       The Court sets a case management conference for July 17, 2025, at 10:00 a.m., in

2 Courtroom 11, San Francisco.  A joint case management statement is due by July 10, 2025.  The

3 case management statement should contain an expedited proposed schedule and trial date.

4       **IT IS SO ORDERED.**

5 Dated:  June 24, 2025

 

 

_____

JAMES DONATO
United States District Judge