1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10    AMERICAN FEDERATION OF                    CASE NO. C25-451 MJP
      GOVERNMENT EMPLOYEES, AFL-
11    CIO; AMERICAN FEDERATION OF               ORDER DENYING MOTION TO
      GOVERNMENT EMPLOYEES, AFL-                DISMISS
12    CIO TSA LOCAL 1121;
      COMMUNICATIONS WORKERS OF
13    AMERICA, AFL-CIO; and
      ASSOCIATION OF FLIGHT
14    ATTENDANTS-CWA, AFL-CIO,

15                      Plaintiffs,

16          v.

17    KRISTI NOEM; U.S. DEPARTMENT
      OF HOMELAND SECURITY; HA
18    NGUYEN MCNEILL; and
      TRANSPORTATION SECURITY
19    ADMINISTRATION,

20                      Defendants.

21

22          This matter comes before the Court on Defendants' Motion to Dismiss. (Dkt. No. 37.)

23    Having reviewed the Motion, Plaintiffs' Response (Dkt. No. 42), the Reply (Dkt. No. 43), the

24

1  Supplemental Authority (Dkt. Nos. 44, 46), and all supporting materials, the Court DENIES the

2  Motion. Having already held oral argument on Plaintiffs' Motion for Preliminary Injunction,

3  which presented overlapping issues, the Court finds this matter suitable for decision without oral

4  argument.

5  **BACKGROUND**

6  Plaintiffs AFGE, an AFGE Local, and two other labor unions challenge the February 27,

7  2025 determination of Kristi Noem, Secretary of DHS, to end collective bargaining and rescind

8  the 2024 CBA entered into between AFGE and the TSA. Plaintiffs contend the Noem

9  Determination violates the Administrative Procedure Act, constitutes First Amendment

10  retaliation, and violates the Fifth Amendment by failing to accord the AFGE and its members

11  with any due process. Plaintiffs sought and obtained a preliminary injunction to stop the

12  enforcement of the Noem Determination and ensure the 2024 CBA remains in place for the

13  duration of this litigation and, ultimately, for its full seven-year term. Defendants now seek

14  dismissal of the Complaint. To orient the reader, the Court reviews the relevant background

15  regarding the parties, the TSA's historic approach to collective bargaining for TSOs, the Noem

16  Determination, and allegations of anti-AFGE animus behind the Noem Determination.

17  **A.    Parties**

18  Plaintiffs include: (1) AFGE; (2) AFGE TSA Local 1121; (3) the Communications

19  Workers of America (CWA); and (4) the Flight Attendants-CWA, AFL-CIO (AFA). (Complaint

20  ¶¶ 15, 20, 22, 24 (Dkt. No. 1).) AFGE is the largest federal union, representing approximately

21  800,000 federal civilian employees through its affiliated councils and locals in every state in the

22  United States, which includes "security officers protecting our airports and airplanes[.]" (Id. ¶¶

23  15-16.) AFGE TSA Local 1121 is a labor organization and unincorporated association residing

24

1   in Kent, Washington that represents transportation security officers, including those at Sea-Tac

2   International Airport. (Id. ¶ 20.) CWA is a labor union that represents approximately 30,000

3   workers including some who work in airports across the nation who handle ticketing, luggage,

4   and other customer services. (Id. ¶ 22.) Plaintiff AFA is a labor union that represents over 55,000

5   flight attendants who rely on TSOs to help ensure safe and secure airport screening. (Id. ¶¶ 24-

6   25.) Plaintiffs pursue their claims on behalf of their members, and the AFGE national and local

7   bring claims on their own behalf. (Id. ¶¶ 15, 19, 21, 23, 26.)

8        Plaintiffs bring claims against DHS and its Secretary, Kristi Noem, and TSA, and its

9   acting Administrator, Ha Nguyen McNeill (who was substituted for Adam Stahl, named in the

10  Complaint) (Compl. ¶¶ 27-30.)

11  **B.    Background to 2024 CBA**

12       Passed in 2001, the Aviation and Transportation Security Act (ATSA) created the TSA to

13  be led by an Administrator appointed by the President with the advice and consent of the Senate

14  for a five-year term. 49 U.S.C. § 114(a), (b). Unlike other federal employees, TSA employees are

15  governed by a personnel management system established by the administrator of the Federal

16  Aviation Administration, subject to modifications made by the TSA Administrator. 49 U.S.C. §

17  114(n). As to Transportation Security Officers (TSOs), the Administrator "may employ, appoint,

18  discipline, terminate, and fix the compensation, terms, and conditions of employment." ATSA §

19  111(d), 49 U.S.C. § 44935 note. Congress provided the Administrator "shall establish levels of

20  compensation and other benefits for individuals so employed." Id.

21       In 2003, James M. Loy, the Under Secretary of the Department of Transportation,

22  determined that the newly-formed TSA's screeners would not be permitted to engage in

23  collective bargaining. See Am. Fed'n of Gov't Emps., AFL-CIO v. Loy, 281 F. Supp. 2d 59, 61

24

(D.D.C. 2003), aff'd, 367 F.3d 932 (D.C. Cir. 2004). The Court refers to this as the Loy Determination. But in 2011, TSA Administrator John S. Pistole established a collective bargaining structure for TSOs. (Compl. ¶ 39.) Pistole based his decision on employee surveys, workforce data, and "many views in the context of considering TSA's mission requirements." (Id.) The determination "set forth a 'comprehensive structure . . . that will provide for genuine, binding collective bargaining on specified subjects at the national level with the union, if any, that prevails in an election process.'" (Id. (quoting Feb. 4, 2011 Decision Mem., John S. Pistole ("2011 Determination"), at 2-5.)).)

In June 2011, TSOs elected AFGE to be their exclusive representative, and AFGE began bargaining collectively with TSA. (Compl. ¶ 41.) In November 2012, the parties signed their first binding CBA. (Id. ¶ 42.) TSA and AFGE agreed to new CBAs in 2016 and 2020. (Id. ¶ 43.) In late 2022, the TSA Administrator David Pekoske, who was appointed by President Trump, issued a new determination on collective bargaining. (Id. ¶ 44 (citing Determination from Pekoske on Transp. Sec. Officers and Collective Bargaining (Dec. 30, 2022) ("2022 Determination").) Pekoske noted that his determination "recogniz[ed] that TSA's dedicated employees are critical to the success of our mission." (Id.) The 2022 Determination expanded collective bargaining rights to TSOs, but did not permit bargaining over compensation. (Id. ¶¶ 45-48.)

In May 2024, AFGE and TSA signed their current CBA—the "2024 CBA". (Compl. ¶¶ 50-51.) The 2024 CBA sets certain terms and conditions of employment for TSOs. (Id.) The 2024 CBA recognized AFGE as TSOs' exclusive representative. (Id. ¶ 54.) It also gave TSOs a right to have a union representative present in disciplinary interviews (Weingarten rights), and it granted AFGE the right to be present at formal discussions about grievances or conditions of

1    employment. (Id. ¶ 56.) The 2024 CBA also provided that discipline or adverse actions "may be

2    taken for just cause and only for reasons that will promote the efficiency of the service." (Id. ¶ 55

3    (quoting 2024 CBA Art. 27(C)).) The CBA was agreed to "remain in full force and effect" for

4    seven years. (Id. ¶ 61 (quoting 2024 CBA Art. 37(B)).) And while no TSO is required to join the

5    union or pay dues, if a TSO voluntarily chooses to pay dues through their paycheck, the 2024

6    CBA guarantees that TSA would deduct those dues and remit them to AFGE. (Id. ¶¶ 57-58.) The

7    2024 CBA also established a binding grievance and arbitration process allowing parties to

8    challenge CBA violations or other violations affecting conditions of employment. (Id. ¶¶ 55-57.)

9    "At the signing ceremony, TSA Administrator Pekoske stated that '[i]f we didn't have this CBA,

10   if we didn't have this pay package, I would submit to you, we probably wouldn't have a TSA in

11   five or 10 years," noting "[t]hat's how important it is." (Id. ¶ 52 (citation omitted).)

12   **C.**    **Rescission of the 2024 CBA**

13         On February 27, 2025, Secretary Noem issued a memorandum to Adam Stahl, the senior

14   official performing the duties of the Administrator of TSA, entitled "Supporting the TSA

15   Workforce by Removing a Union That Harms Transportation Security Officers" ("Noem

16   Determination"). (Compl. ¶ 68.) The Noem Determination states that "[e]ffective immediately,"

17   she rescinded the 2022 Determination and claimed that the 2024 CBA is "no longer applicable or

18   binding and is hereby rescinded." (Id. ¶¶ 70-71.) She wrote that "AFGE is no longer the

19   exclusive representative" of TSOs and discontinued the ability for TSOs to pay voluntary dues

20   from their paychecks. (Id. ¶ 71.) Plaintiffs did not receive notice of Noem's intent to sign the

21   determination and Defendants did not follow the bargaining procedures set out in the 2024 CBA.

22   (Id. ¶ 76.)

23

24

1    Noem stated in her memo "that the more than a decade of TSA Determinations that

2    permitted collective bargaining were 'misplaced directives' that 'have solely benefited the

3    American Federation of Government Employees (AFGE) at TSOs' expense.'" (Compl. ¶ 69.) In

4    a follow-on press release, DHS stated that "TSOs are losing their hard-earned dollars to a union

5    that did not represent or protect their interests." (Id. ¶ 79.) The press release includes a statement

6    from a DHS spokesperson: "Thanks to Secretary Noem's action, Transportation Security

7    Officers will no longer lose their hard-earned dollars to a union that does not represent them. The

8    Trump Administration is committed returning to merit-based hiring and firing policies." (Id. ¶

9    80.)

10   **D.    Alleged Animus**

11   Plaintiffs cite to various evidence of the Defendants' claimed animus against AFGE.

12   First, Plaintiffs note that Noem Determination itself attacks AFGE by name, stating the prior

13   determinations and CBA "have solely benefited the American Federation of Government

14   Employees (AFGE) at TSOs' expense." (Compl. ¶ 69.) Second, Plaintiffs note that the Noem

15   Determination follows AFGE's litigation efforts to push back against the Trump

16   Administration's decision to terminate federal workers and limit their collective bargaining

17   rights. See, e.g., AFGE v. Trump, No. 1:25-cv-00264 (D.D.C.); AFGE v. Ezell, No. 1:25-cv-

18   10276 (D. Mass.); AFGE v. OPM, No. 3:25-cv-01780 (N.D. Cal.); (Compl. ¶ 65). Plaintiffs

19   highlight that on February 27, 2025 (the same day of the Noem Determination), a district court

20   issued a temporary restraining order against the Office of Personnel Management, in favor of

21   AFGE. (Compl. ¶ 67 (citing AFGE v. OPM, 2025 WL 660053, at *14 (N.D. Cal. Feb. 28, 2025)

22   (referencing Feb. 27 oral order)).) Third, Plaintiffs assert that President Trump issued a

23   memorandum for agency heads targeting litigants like AFGE, stating "[i]n recent weeks, activist

24

1   organizations . . . have obtained sweeping injunctions . . . undermining the democratic process."

2   (See Compl. ¶ 77.) Fourth, Plaintiffs point out that unions the President believes will "work with

3   him," still have collective bargaining rights, which undermines the justification advanced in the

4   Noem Determination. See Order, 90 Fed. Reg. 16427 (Apr. 17, 2025) (expressly restoring

5   bargaining rights to specific unions).

6                                              **ANALYSIS**

7   **A.       Legal Standard**

8           Defendants move to dismiss for lack of subject matter jurisdiction and for failure to state

9   a claim. Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss for

10  lack of subject matter jurisdiction. Upon such a motion, the plaintiff party bears the burden of

11  establishing the court's jurisdiction. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375,

12  377 (1994). In contrast, a motion to dismiss for failure to state a claim tests the legal sufficiency

13  of the claims under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is

14  appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to

15  support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097,

16  1104 (9th Cir. 2008). In ruling on a Rule 12(b)(6) motion, the Court must accept all material

17  allegations as true and construe the complaint in the light most favorable to the non-movant.

18  Wyler Summit P'Ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 661 (9th Cir. 1998). To survive

19  dismissal, the complaint "must contain sufficient factual matter, accepted as true, to 'state a

20  claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing

21  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

22

23

24

1    After considering standing, the Court reviews Defendants' jurisdictional challenges under

2    Rule 12(b)(1) and then considers their Rule 12(b)(6) challenges to Plaintiffs' Due Process and

3    First Amendment claims.

4    **B.    Plaintiffs Have Standing**

5    Although Defendants do not contest Plaintiffs' standing, the Court briefly reviews the

6    issue. Both AFGE and the AFGE Local have organizational standing, as the Noem

7    Determination here "perceptibly impair[s] their ability to perform the services they were formed

8    to provide." E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 663, 677 (9th Cir. 2021). These

9    same Plaintiffs have standing to represent their members, who had grievances terminated and

10   have lost protections including "just cause" protections and union representation in investigatory

11   interviews. See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ., 82

12   F.4th 664, 681 (9th Cir. 2023) (en banc) (describing representational standing requirements).

13   **C.    The Court has Jurisdiction Over Plaintiffs' Claims Notwithstanding the FLRA**

14   Defendants argue that the Court lacks jurisdiction because Congress has "implicitly

15   precluded district courts from reviewing the agency action at issue," the dispute must be

16   presented to the Federal Labor Relations Authority (FLRA). This argument rests on a very

17   limited jurisdictional preclusion theory announced in Thunder Basin Coal Co. v. Reich, 510 U.S.

18   200, 207 (1994). The Court continues to disagree with Defendants' argument, finding that the

19   agency action here is not of the kind committed to the FLRA's limited review.

20   To unpack the arguments, the Court reviews the scope and function of the FLRA, the

21   contours of Thunder Basin preclusion, and the question of whether the claims here must be

22   brought before the FLRA.

23

24

1          **1.       The FLRA**

2          "In 1978, Congress enacted the Federal Service Labor-Management Relations Statute

3    (the "Statute" or FSLMRS) to govern labor relations between the executive branch and its

4    employees." Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 752 (D.C. Cir.

5    2019). The Statute is set forth in Title VII of the Civil Service Reform Act (CSRA) and codified

6    at 5 U.S.C. §§ 7101-35. Id. (citing Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (1978)).

7    "The Statute also establishes a scheme of administrative and judicial review" through "the

8    Federal Labor Relations Authority (FLRA), a three-member agency charged with adjudicating

9    federal labor disputes, including 'negotiability' disputes and 'unfair labor practice' disputes." Id.

10   (citing 5 U.S.C. § 7105(a)). "In negotiability disputes, the FLRA determines whether agencies

11   and unions must bargain over certain subjects." Id. (citing 5 U.S.C. §§ 7105(a)(2)(E),

12   7117(c)(1)). And "[i]n unfair labor practice proceedings, the FLRA resolves whether an agency

13   must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to

14   comply with the Statute." Id. (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118). Any decision

15   from the FLRA may be appealed to the D.C. Circuit Court of Appeals. Id. (citing 5 U.S.C. §

16   7123(a), (c)).

17         **2.       Thunder Basin Preclusion**

18         District courts generally have jurisdiction over claims arising under federal law. See 28

19   U.S.C. § 1331. But "[a] special statutory review scheme, this Court has recognized, may

20   preclude district courts from exercising jurisdiction over challenges to federal agency action."

21   Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. 175, 185 (2023) (citing Thunder Basin Coal

22   Co. v. Reich, 510 U.S. 200, 207 (1994)). Congress may explicitly remove jurisdiction for certain

23   claims or it may do so "implicitly, by specifying a different method to resolve claims about

24

1    agency action." Id. As examples of implicit jurisdictional preclusion, the Supreme Court has

2    cited the Exchange Act and FTC Act's inclusion of an agency review process followed by

3    review in a court of appeals. Id. But a comprehensive statutory review process alone does not

4    necessarily mean that every claim concerning agency action falls outside the district court's

5    jurisdiction. Id.

6        To determine whether Congress implicitly sought to preclude general federal jurisdiction,

7    the Court generally asks "whether the particular claims brought were 'of the type Congress

8    intended to be reviewed within this statutory structure.'" Axon, 598 U.S. at 186 (quoting

9    Thunder Basin, 510 U.S. at 208). There are "three considerations designed to aid in that inquiry,

10   commonly known now as the Thunder Basin factors." Id. at 186. First, could precluding district

11   court jurisdiction "foreclose all meaningful judicial review" of the claim? Thunder Basin, 510

12   U.S. at 212–213. This "first Thunder Basin factor recognizes that Congress rarely allows claims

13   about agency action to escape effective judicial review." Axon, 598 U.S. at 186. Second, is the

14   claim "wholly collateral to [the] statute's review provisions"? Thunder Basin, 510 U.S. at 212

15   (internal quotation marks omitted). Third, is the claim "outside the agency's expertise"? Id. "The

16   second and third [considerations] reflect in related ways the point of special review provisions—

17   to give the agency a heightened role in the matters it customarily handles, and can apply

18   distinctive knowledge to." Axon, 598 U.S. at 186. Ultimately, "[w]hen the answer to all three

19   questions is yes, we presume that Congress does not intend to limit jurisdiction." Id. (citation and

20   quotation omitted). "But the same conclusion might follow if the factors point in different

21   directions." Id. "The ultimate question is how best to understand what Congress has done—

22   whether the statutory review scheme, though exclusive where it applies, reaches the claim in

23   question." Id.

24

**3.** **The Claims Are Not Subject to FLRA Jurisdiction under <u>Thunder Basin</u>**

The three <u>Thunder Basin</u> considerations here weigh against finding implicit jurisdictional preclusion.

The first <u>Thunder Basin</u> consideration weighs in favor of this Court's jurisdiction. Although Defendants are correct that FLRA decisions can be appealed to the D.C. Court of Appeals, that fact alone does not mean that the claims here can be brought before the FLRA. Defendants' argument falls apart because the 2011 and 2022 Determinations and the Noem Determination expressly bar FLRA review in the first instance. The 2011 Determination, which established TSOs' first collective bargaining structure, "set forth . . . a comprehensive structure that is different and distinct, separate and independent, from that provided in 5 U.S.C. Chapter 71[.]" (2011 Determination at 5.) The 2011 Determination explained that except for "an election conducted by the FLRA . . . [the] ATSA § 111(d) supersedes the Federal Services Labor-Management Relations statute (5 U.S.C. Chapter 71) in all other respects and therefore Chapter 71 shall not apply, or afford any rights, to management, unions, or covered employees that are not expressly provided in this Determination." (<u>Id.</u> at 6.) The 2022 Determination similarly eschewed adoption of FLRA jurisdiction, stating that "[a]s jurisdiction on FLRA cannot be conferred administratively, any provision of Chapter 71 or its implementing regulations regarding FLRA are not adopted by this Determination." (2022 Determination § 9.) And, lastly, Noem's Determination rejected incorporating FSLMRS or FLRA jurisdiction: "This Determination does not incorporate by reference any provisions of Chapter 71 of Title 5 of the United States Code or its implementing regulations for these employees, any union, or TSA management." (Noem Determination at 3.) Thus, by the plain language of these three Determinations, Plaintiffs would not be permitted to pursue their claims before the FLRA.

1    Defendants have contended that AFGE could bring its claims as an unfair labor practice by

2    asking for review under 5 U.S.C. § 7118(a). But as Plaintiffs noted, this requires petitioning the

3    General Counsel of the FLRA to investigate the claim, 5 U.S.C. 7118(a), and there is no right to

4    appeal the General Counsel's refusal to commence proceedings, see 5 U.S.C. § 7123(a). See Am.

5    Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt., No. C 25-01780 WHA,

6    2025 WL 900057, at *5 (N.D. Cal. Mar. 24, 2025). And there is currently no General Counsel of

7    the FLRA, as the position remains vacant. The Court is persuaded by Plaintiffs' arguments that

8    undermine Defendants' position.

9        The second Thunder Basin consideration also weighs in favor of this Court's jurisdiction

10   because the claims are collateral to and far afield of the FLRA's core agency review. Defendants

11   argue that the FSLMRS "'establishes a scheme of administrative and judicial review' for labor

12   relations disputes between the Executive Branch and unions representing federal employees."

13   (Defs. Mot. at 5 (citing AFGE v. Trump, 929 F.3d 748, 752 (D.C. Cir. 2019)). But the FLRA has

14   a far narrower review mandate, principally designed to hear disputes about negotiability and

15   unfair labor practices. AFGE, 929 F.3d at 752. Here, Plaintiffs' challenge to the Noem

16   Determination does not implicate negotiability—whether TSA must bargain with a union—or

17   unfair labor practices. Rather, it challenges the legality of Noem's decision to rescind a fully-

18   bargained-for CBA before its term has expired. The present dispute falls far afield of the core

19   function of the FLRA.

20       Defendants argue that the FLRA has exclusive jurisdiction for the same reasons the D.C.

21   District Court found that challenges to the 2003 Loy Determination barring collective bargaining

22   were subject to exclusive agency review. (Defs. Mot. at 6-7 (citing Am. Fed'n of Gov't Emps.,

23   AFL-CIO v. Loy, 281 F. Supp. 2d 59, 64–65 (D.D.C. 2003), aff'd, 367 F.3d 932 (D.C. Cir.

24

1    2004)).) The Court disagrees, given certain fundamental distinctions between the Loy

2    Determination and the Noem Determination. In response to the Loy Determination, AFGE filed

3    petitions with the FLRA to hold union elections, and filed suit in district court, lodging

4    constitutional and APA challenges to the Loy Determination. See Loy, 281 F. Supp. 2d at 61-62.

5    The District Court found that the claims brought before it could have been included in the FLRA

6    action, though it considered them on their merits. Id. at 64-65. On appeal, the D.C. Circuit

7    affirmed dismissal of the action, noting that the constitutional and statutory claims should have

8    been presented to the FLRA. AFGE v. Loy, 367 F.3d 932, 936-37 (D.C. Cir. 2004). While the

9    Loy Determination concerned elections and negotiability that the parties agreed were subject to

10   the FLRA's jurisdiction, the Noem Determination focuses on an agency action to rescind a fully-

11   bargained-for CBA that was already in effect and had nothing to do with elections, negotiability,

12   or unfair labor practices. Nothing in Loy suggests that the Noem Determination falls within the

13   FLRA's core competencies, and Defendants have not explained why it would.

14            Defendants cite to two additional cases where the court found jurisdictional preclusion

15   concerning union claims that had to be brought before the FLRA. (Defs. Mot. at 5-6, 8 (citing

16   AFGE v. Trump, 929 F.3d 748 (D.C. Cir. 2019); Nat'l Treasury Emps. Union v. Trump, 770 F.

17   Supp. 3d 1 (D.D.C. 2025).) The Court finds neither case persuasive as to the issues raised by the

18   present litigation. Both cases involve challenges to the subjects of collective bargaining or to

19   termination of union members covered by a CBA, not the distinct agency action of terminating

20   an entire CBA. The Court briefly reviews both cases to highlight their distinctive differences.

21            First, in AFGE v. Trump, the plaintiffs challenged three executive orders that: "(1)

22   direct[ed] agencies to refuse to bargain over 'permissive' subjects based on 5 U.S.C. §

23   7106(b)(1); (2) establish[ed] government-wide rules for employee and agency conduct, which

24

1  may have the effect of removing mandatory subjects from bargaining based on 5 U.S.C. §

2  7117(a)(1); and (3) set goals that agencies must pursue during bargaining." Id., 929 F.3d at 753.

3  The Court explained that these Executive Orders could be challenged before the FLRA because

4  they could form the basis of a "bad-faith bargaining" claim or claim that the Government was

5  ignoring topics of bargaining that must be included under the FSLMRS. Id. at 757-58. But here,

6  the challenge to the rescission of a CBA does not implicate bargaining or elections. Rather, the

7  challenge here is solely to the action of rescinding a CBA, which does not fall within the FLRA's

8  core functions concerning "negotiability" or any other Congressionally-mandated expertise.

9        Second, in NTEU, the plaintiff unions challenged several executive orders that Trump

10  issued to terminate probationary employees, prepare for large-scale reductions in force, and to

11  offer deferred resignation. Id., 770 F. Supp. 3d at 3. Unlike here, the unions conceded that they

12  could bring their claims before the FLRA, and the Court found that the FLRA provided for

13  meaningful review, possessed at least some agency expertise, and the collateral claims were not

14  "far afield from the agency's usual review." Id. at 8-11. Here, the challenge is not to the

15  termination of employees or deferred resignation. The question is whether the Noem

16  Determination to rescind the CBA is permissible and has caused constitutional harms. The

17  question of whether to rescind a CBA is not akin to the question of whether individual

18  employees may be fired or asked to retire. And Defendants have offered no explanation of how

19  the facts here align.

20        The final Thunder Basin factor also favors finding no claim preclusion because there is

21  no apparent expertise in the FLRA to determine whether a rescission decision violates the APA

22  or the constitution.

23

24

ORDER DENYING MOTION TO DISMISS - 14

On balance, the Court finds that the <u>Thunder Basin</u> considerations all point to allowing the case to proceed in this Court. There is little evidence that Congress implicitly intended the FLRA to handle a dispute over an agency decision to rescind a CBA.

**D.    Plaintiffs' APA Claim Is Reviewable**

Defendants argue the Noem Determination is not reviewable under the APA because it is "committed to agency discretion by law" and therefore exempt under 5 U.S.C. § 701(a)(2). (Defs. Mot. at 11-16.) The Court disagrees.

"The Administrative Procedure Act embodies a 'basic presumption of judicial review,' <u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A)." <u>Dep't of Com. v. New York</u>, 588 U.S. 752, 771 (2019). "Most—but not all—final agency actions are reviewable," subject to two exceptions. <u>Trout Unlimited v. Pirzadeh</u>, 1 F.4th 738, 751 (9th Cir. 2021). Defendants highlight one exception to APA's presumption of judicial review—for "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

The Supreme Court has "read the § 701(a)(2) exception for action committed to agency discretion quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." <u>Dep't of Com.</u>, 588 U.S. at 772 (citation and quotation omitted). The APA expressly contemplates judicial review of an agency's ordinary discretionary judgments by authorizing review of an agency's action for "abuse of discretion." 5 U.S.C. § 706(2)(A). The Section 701(a)(2) exception therefore applies only "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion." <u>Trout Unlimited</u>, 1

F.4th at 751 (quoting <u>Heckler v. Chaney</u>, 470 U.S. 821, 830 (1985)). "Only where there is truly

no law to apply have we found an absence of meaningful standards of review." <u>Perez Perez v.</u>

<u>Wolf</u>, 943 F.3d 853, 861 (9th Cir. 2019) (internal quotation marks omitted). "So long as the

regulations provide a 'meaningful standard' by which a court could review the [agency's] actions

and our review of the agency's compliance with those regulations does not infring[e] any of the

[agency's] prerogatives under the statute, then we have jurisdiction, pursuant to the APA, to

review the agency's compliance with its own regulations." <u>Trout Unlimited</u>, 1 F.4th at 752

(citation and quotation omitted).

Judicially-manageable standards against which to measure agency action can derive from

a variety of sources, not just regulations and statutes. "In order to assess whether the court has a

meaningful standard against which to judge the agency's exercise of discretion[,] we first look at

the statute itself." <u>ASSE Int'l, Inc. v. Kerry</u>, 803 F.3d 1059, 1069 (9th Cir. 2015) (cleaned up).

The Court may also look to agency regulations or agency practices to determine a meaningful

standard against which to review its exercise of discretion. <u>Id.</u> at 1069 ("Even where statutory

language grants an agency unfettered discretion, its decision may nonetheless be reviewed if

regulations or agency practice provide a meaningful standard by which this court may review its

exercise of discretion."). Similarly, the Ninth Circuit has found that agency memoranda

implementing policies to provide a meaningful standard against which to test agency action.

<u>Alcaraz v. I.N.S.</u>, 384 F.3d 1150, 1161 (9th Cir. 2004).

The Parties here agree that § 111(d) of the ATSA gives DHS broad discretion to

determine whether or not to engage in collective bargaining. (Mot. at 12; Pls. Opp. at 15.)

Specifically, Section 111(d) gives the TSA Administrator authority to "employ, appoint,

discipline, terminate, and fix the compensation, terms, and conditions of employment of Federal

1    service" for security screeners. 49 U.S.C. § 44935. Nonetheless, Plaintiffs argue that the 2024

2    CBA offers sufficient agency policy standards against which to measure Noem's exercise of

3    discretion.

4          The Court agrees with Plaintiffs that the 2024 CBA is a "self-imposed restriction on

5    agency discretion" that provides a meaningful standard by which the Court may review Noem's

6    exercise of discretion. (Pls. Opp. at 15-16.) The CBA also conferred a benefit to TSOs by

7    allowing them to collectively bargain, to have certain procedural rights. And the CBA allowed

8    AFGE to act as a representative for its TSO member in various proceedings. The outcome here is

9    similar to that in ASSE, 803 F.3d at 1069-70. There, the agency had full discretion to create—or

10   not—an exchange visitor programs, and once it adopted regulations creating such a program, it

11   created a judicially reviewable standard. ASSE, 803 F.3d at 1069-70. Here, although TSA has

12   discretion in how it employs TSOs, once it entered into the CBA, it set a policy and practice

13   against which to measure Noem's exercise of discretion and it conferred rights on TSOs that they

14   would not have otherwise enjoyed. And while the CBA here is not a regulation, it has the same

15   force of one, as it is a statement of policy and a practice, which the Ninth Circuit has found

16   sufficient to form a legal standard for review. See Alcaraz, 384 F.3d at 1161; ASSE, 803 F.3d at

17   1069. This follows the Ninth Circuit's explanation in Trout Unlimited, that an agency

18   determination made under broad discretionary authority can nevertheless cabin agency discretion

19   to make it reviewable under the APA, much like the public duty doctrine—while "a person has

20   no duty to undertake a rescue but, once a rescue is attempted, the rescuer is held to a duty of

21   care." Trout Unlimited, 1 F.4th at 756.

22         Defendants argue that the Noem Determination is unreviewable as a form of non-

23   enforcement decision that the Supreme Court has exempted from review. (See Defs. Mot. at 14

24

1    (citing <u>Dep't of Homeland Sec. v. Regents of the Univ. of California</u>, 591 U.S. 1 (2020)).) This is

2    not convincing. Defendants are correct that the Supreme Court has recognized a "limited

3    category of unreviewable actions [that] includes an agency's decision not to institute

4    enforcement proceedings[.]" <u>Regents</u>, 591 U.S. at 17 (citing <u>Heckler</u>, 470 U.S. at 831–32). For

5    example, in <u>Heckler</u> the Supreme Court recognized that the FDA's refusal to institute

6    enforcement actions against two States to prevent their use of certain drugs for lethal injunction

7    was beyond review because a "refusal to act" does not "provide[] a focus for judicial review." <u>Id.</u>

8    at 832. But the Supreme Court has since distinguished <u>Heckler</u> in considering DACA, finding the

9    immigration program to be not only a non-enforcement policy, but also one that conferred

10   various benefits to immigrants who fit within the program. <u>Regents</u>, 591 U.S. at 18-19 (noting

11   that "[u]nlike an agency's refusal to take requested enforcement action, access to these types of

12   benefits is an interest "courts often are called upon to protect" (cleaned up)). As explained in

13   <u>Regents</u>, an agency determination that includes both non-enforcement and which confers benefits

14   falls within APA review. Here, like the DACA program in <u>Regents</u>, the CBA confers benefits on

15   TSOs and the Union, set a policy of engaging in collective bargaining for the agency itself, and

16   ultimately set a meaningful standard against which to assess the Noem Determination under the

17   APA. As such, the Court rejects Defendants' argument that CBA is akin to a non-enforcement

18   policy that cannot be reviewed.

19   **E.    No Merit to Defendants' Tucker Act Arguments**

20         Defendants argue that the APA bars Plaintiffs' claims because they are essentially breach

21   of contract claims that must be brought before the Court Federal Claims under the Tucker Act,

22   28 U.S.C. § 1491(a)(1). (Defs. Mot. at 16-20.) This argument misconstrues Plaintiffs' claims in

23   an errant effort to shoehorn them into a jurisdictional exclusion.

24

1    As is relevant here, the APA's waiver of sovereign immunity "does not apply to claims

2    for 'money damages' or claims 'expressly or impliedly forbid[den]' by another statute granting

3    consent to suit." Tucson Airport Auth. v. Gen. Dynamics Corp., 136 F.3d 641, 645 (9th Cir.

4    1998) (citing 5 U.S.C. § 702). Instead, only "[a]gency action made reviewable by statute and

5    final agency action for which there is no other adequate remedy in a court" are subject to judicial

6    review. 5 U.S.C. § 704. As the Ninth Circuit has explained, "the APA waives sovereign

7    immunity for . . . claims only if three conditions are met: (1) its claims are not for money

8    damages, (2) an adequate remedy for its claims is not available elsewhere and (3) its claims do

9    not seek relief expressly or impliedly forbidden by another statute." Tucson Airport, 136 F.3d at

10   645.

11    Defendants argue that APA's waiver of sovereign does not reach the claims here because

12   they are all forms of contract claims over which Tucker Act provides an adequate remedy. But

13   Plaintiffs correctly note that the CBA is not a contract over which the Tucker Act confers

14   jurisdiction. "The government's consent to suit under the Tucker Act does not extend to every

15   contract." Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1343 (Fed. Cir. 2008).

16   For the Act to apply, there must be a "money-mandating" feature of the contract that would give

17   a substantive right to recover damages in the event of breach. Id. at 1344. For example, a cost-

18   sharing agreement between the government and a private company was not a money-mandating

19   contract sufficient to confer Tucker Act jurisdiction. Id. Here, the CBA is not a money-

20   mandating agreement—it merely sets forth various agreements about the terms of employment,

21   bargaining rights, and union representation rights. To the extent the CBA allows the union to

22   collect contributions, those payments come from the members, not the government, such that it

23   cannot be found to be a money-mandating contract. And as the Ninth Circuit has acknowledged,

24

1    "[a]n action for specific performance is not an action for "money damages" under APA § 702,

2    even if the remedy may actually require a payment of money by the government." <u>Tucson</u>, 136

3    F.3d at 645. Defendants do not argue that the CBA is a money-mandating contract, but cite

4    instead to cases involving claims that the Federal Court of Claims denied, and were nonetheless

5    barred by review in the District Courts. (Mot. at 19.) But none of these cases held that an

6    agreement falling outside the Tucker Act are also precluded from review by the District Court.

7    The Court finds no merit in Defendants' argument.

8         The Court also finds no merit in Defendants' argument that the Tucker Act precludes

9    Plaintiffs' First Amendment claim (Count III). (Mot. at 18 (citing <u>Tucson Airport</u>, 136 F.3d at

10    647).) Defendants argue that Plaintiffs' First Amendment claim is an empty label applied to hide

11    what is simply a contract-based claim. But Defendants have not explained why this supposition

12    is true. While the retaliatory acts concern the CBA, the First Amendment claim stands apart and

13    alone from the contract itself. Nor does <u>Tucson Airport</u>, the sole authority Defendants cite,

14    support the argument. In that case, the Court merely held that due process, takings, and public

15    debt claims seeking money damages which all "ar[ose] from a contract with the United States

16    government" were subject to the Tucker Act. <u>See Tucson Airport</u>, 136 F.3d at 647. Even if one

17    might frame Plaintiffs' First Amendment claim as arising out of a contract, the claim does not

18    seek money damages and the CBA lacks the dispositive money-mandating feature for the Tucker

19    Act to apply.

20         Defendants fail to demonstrate that the APA and Tucker Act preclude jurisdiction over

21    Plaintiffs' claims.

22

23

24

ORDER DENYING MOTION TO DISMISS - 20

**F.    Plaintiffs Have Adequately Pleaded a Due Process Claim**

Defendants contend that Plaintiffs have not adequately pleaded their Due Process claim on the theory that the CBA did not confer any protected property interest. The Court disagrees.

Plaintiffs argue that they were denied Fifth Amendment Due Process when Noem rescinded the CBA and all outstanding grievances without notice or process. The Court finds Plaintiffs likely to succeed on this claim.

In order to have a Fifth Amendment claim, Plaintiffs must demonstrate a constitutionally-protected property interest. "[I]t has long been settled that a contract can create a constitutionally protected property interest." San Bernardino Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cnty., 825 F.2d 1404, 1407–08 (9th Cir. 1987). A "constitutionally protectible entitlement may arise from contractual language providing for discharge from employment only for 'cause,' or even from the mere fact that a contract provides for continued employment during a fixed term." Id. (citation omitted). But not every contract provision creates an enforceable right. In order to have a property interest in a benefit, a person must demonstrate that he or she has a legitimate claim of entitlement to it, not merely a unilateral expectation. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972).

Plaintiffs have adequately pleaded a claim that the CBA provides a legitimate entitlement to certain rights in "their continued employment at TSA" and that this conferred a constitutionally-protected Due Process right. Plaintiffs note that under the CBA, "Disciplinary and/or Adverse Actions may be taken for just cause and only for reasons that will promote the efficiency of the service." (2024 CBA Art. 27(C)(3); Compl. ¶¶ 54-56.) The Court finds that these allegations suffice to show that the CBA confers an entitlement that has been affected by the termination of the CBA without any process. See San Bernardino, 825 F.2d at 1408.

1   Additionally, Plaintiffs have also identified a right to file grievances, which confers an

2   entitlement to benefits that are more than a unilateral expectation. (Compl. ¶¶ 56, 74, 78, 101,

3   130.) And, more importantly, Plaintiffs have alleged that these rights were infringed when the

4   CBA was terminated and they were afforded no notice and no process before termination of the

5   grievances. (Id. ¶ 130.) These allegations are adequate to state a Due Process claim.

6       The Court also notes that the sole case Defendants cite remains distinguishable in

7   material aspects. Ortloff v. Trimmer, No. C16-1257RSL, 2018 WL 2411755, at *3 (W.D. Wash.

8   May 29, 2018), aff'd, 773 F. App'x 903 (9th Cir. 2019). Ortloff concerned probationary

9   employees who were required by a collective bargaining agreement to be given "bona fide

10  reasons" for termination before the end of the probationary period. Id. The Court found that

11  probationary employees had no protected right because the agreement imposed only a

12  "reasonableness" or "good faith" standard and it did not confer an interest in continued

13  employment. Here, the CBA confers specific rights affecting the terms of employment, imposes

14  a "just cause" basis for termination, and gives members the right to file grievances, far beyond

15  the limited standards at issue in Ortloff.

16  **G.   Plaintiffs Have Adequately Pleaded a First Amendment Claim**

17      The Court finds that Plaintiffs have sufficiently pleaded a First Amendment retaliation

18  claim.

19      To state a claim for First Amendment retaliation, the Plaintiff must show "that (1) [the

20  plaintiff] was engaged in a constitutionally protected activity, (2) the defendant's actions would

21  chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the

22  protected activity was a substantial or motivating factor in the defendant's conduct." O'Brien v.

23  Welty, 818 F.3d 920, 932 (9th Cir. 2016) (internal quotations omitted). "If an official takes

24

1    adverse action against someone based on that forbidden motive, and non-retaliatory grounds are

2    in fact insufficient to provoke the adverse consequences, the injured person may generally seek

3    relief by bringing a First Amendment claim." Nieves v. Bartlett, 587 U.S. 391, 398 (2019)

4    (quotation omitted). "In assessing whether this causal element is met, courts have also given

5    weight to circumstantial evidence such as a proximity in time between the protected speech and

6    the adverse action, the defendant's expression of opposition to the protected speech, and evidence

7    that the defendant proffered false or pretextual explanations for the adverse action." Boquist v.

8    Courtney, 32 F.4th 764, 777 (9th Cir. 2022).

9         Although Defendants only challenge the adequacy of the alleged animus and causation,

10   the Court reviews all of the necessary elements.

11        As to the first undisputed element, it is apparent that AFGE has been involved in at least

12   three lawsuits against the Trump Administration to stop Trump's efforts to downsize the federal

13   workforce. See, e.g., AFGE v. Trump, No. 1:25-cv-00264 (D.D.C.); AFGE v. Ezell, No. 1:25-

14   cv-10276 (D. Mass.); AFGE v. OPM, No. 3:25-cv-01780 (N.D. Cal.). As such, it has been

15   engaged in protected activity. As to the second element, a person of ordinary firmness would

16   reasonably be deterred from engaging in further litigation if he or she feared loss of job-related

17   benefits.

18        As to animus and causation, there are adequate allegations that the Noem Determination

19   comes from the Trump Administration's dislike for AFGE as a union pushing back against its

20   federal employment policies and asserting its rights to petition the Courts. The Noem

21   Determination attacks AFGE by name, stating the prior Determinations and CBA "have solely

22   benefited the . . . AFGE[] at TSOs' expense." (Compl. ¶ 69; see also id. ¶¶ 68, 79-80.) This

23   statement highlights a direct antipathy towards AFGE, and Plaintiffs' allege that the statement is

24

false. (Compl. ¶ 121.) The Noem Determination also follows closely AFGE's litigation efforts to push back against the Trump Administration's attacks on federal workers. (Compl. ¶¶ 65-67.) Plaintiffs highlight that on February 27, 2025 (the same day of the Noem Determination), a district court issued a temporary restraining order against the Office of Personnel Management, in favor of AFGE. (Comp. ¶ 67 (citing AFGE v. OPM, 2025 WL 660053, at *14 (N.D. Cal. Feb. 28, 2025)).) Plaintiffs also note that President Trump issued a memorandum for agency heads targeting litigants like AFGE, stating "[i]n recent weeks, activist organizations . . . have obtained sweeping injunctions . . . undermining the democratic process." (Compl. ¶ 77). While those acts are not directly tied to Noem personally, they are nevertheless relevant to assessing animus in the context of executive branch actions and a pattern of ongoing retaliation. See Adetuyi v. City of San Francisco, 63 F.Supp.3d 1073, 1090 (N.D. Cal. 2014). And they are not merely coincidental—they fall within a pattern of specific hostility directed towards AFGE. These allegations suffice to show animus and a causal link between the animus and the actions taken to terminate the CBA. See Boquist, 32 F.4th at 777.

Accordingly, the Court finds the claim adequately pleaded and disagrees with Defendants' contention that the allegations are "nothing more than rank speculation." (Reply. at 12.)

**CONCLUSION**

Defendants have failed to convince the Court that it lacks jurisdiction over Plaintiffs' claims. There is no basis on which to find Thunder Basin preclusion. Additionally, the APA claims are reviewable and the Tucker Act poses no bar to any of Plaintiffs' claims. As to the adequacy of the pleadings, the Court disagrees with Defendants' argument that the Due Process and First Amendment claims suffer from pleading deficiencies. Both claims are adequately

1    pleaded, and Defendants do not otherwise challenge the sufficiency of the any other claims. In

2    sum, the Court finds no merit to Defendants' Motion and DENIES it.

3        The clerk is ordered to provide copies of this order to all counsel.

4        Dated August 13, 2025.

5

6        Marsha J. Pechman
         United States Senior District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER DENYING MOTION TO DISMISS - 25